(No. 32362.—

ROBERT SPENCER *et al.,* Appellees, *vs.* ISOM BURNS *et al.,* Appellants.

*Opinion filed September 17, 1952—Rehearing denied Nov. 17, 1952*

JOHN E. FOSTER, JOSEPH P. POWER, JAMES F. LYONS, and ALFRED W. ISRAELSTAM, all of Chicago, for appellants.

WACHOWSKI & WACHOWSKI, of Chicago, (CASIMIR R. WACHOWSKI, and CONRAD J. NADOWSKI, of counsel,) for appellees.

Mr. JUSTICE DAILY delivered the opinion of the court:

This action had its inception in the superior court of Cook County when Robert Spencer, who alleged that he was the surviving spouse of Bertha Spencer, deceased, and Elizabeth Frowner, administratrix of the decedent's estate, filed a complaint seeking to partition real estate owned by Bertha Spencer at her death on February 1, 1948. Named as defendants were Will Burns and Isom Burns, the father and brother of the deceased, who resided in Arkansas and California, respectively. They in turn filed an answer which denied that Robert Spencer was Bertha's husband and a cross complaint which alleged that they were entitled to the real estate, its rents and profits. Shortly thereafter, Columbus Hughes, an illegitimate half-brother of Bertha Spencer, and Shirley Mae Helem and Ronald Helem, the grandchildren of a deceased illegitimate half-sister of Bertha Spencer, joined together and intervened in the cause, alleging that they were entitled to a share of the decedent's estate. Will Burns died before the cause was heard and his administratrix was substituted as a party

defendant and counterclaimant. A hearing was held before a master, and, on the basis of his findings and recommendations, the chancellor entered a decree which awarded Robert Spencer a one-half interest in the real estate as the surviving spouse of Bertha Spencer, one half to Isom Burns, her brother, and denied the claims of the intervening illegitimate half-brother and the grandchildren of the illegitimate half-sister. Isom Burns has appealed to this court, contending that the chancellor erred in finding that Bertha Spencer was married to Robert Spencer and insists that since Will Burns's death, he, Isom, is entitled to the entire fee in the real estate. The intervenors, whose claims pose the question of the rights of an illegitimate and the descendants of an illegitimate to inherit from the lawful issue of the common, deceased maternal ancestor, have also appealed. They reassert their claim to a share of Bertha's estate and join Isom in contending that the court erred in finding that Robert Spencer was the surviving spouse of Bertha Spencer.

First consideration will be given to the issue of whether the proof shows that Robert and Bertha Spencer were ever married. No attempt shall be made to give the evidence in detail, for much of it is in such conflict as to make minute analysis a fruitless task. In general, there is abundant evidence that Robert and Bertha lived together as husband and wife in the home of Bertha's father, Will Burns, at Ferguson, Arkansas, for a period of about six months beginning in June, 1919. There is no evidence of cohabitation after this period. Robert had been courting Bertha and had Will Burns's permission to marry her, and when they took up their abode in the Burns home they told friends and relatives that they had been married at Helena, Arkansas, on June 9, 1919. No witness testified to having seen the ceremony, nor does it appear that either of the parties ever exhibited a wedding certificate. Witnesses for appellee Robert Spencer, stated that the couple had the

reputation of being married in the community where they resided. In contrast, appellants' witnesses testified that the reputation of the relationship was that the parties were just "housekeeping" without benefit of matrimony, which practice, it was stated, was then not uncommon in the community.

Records kept in the court house at the county seat of Phillips County in Helena, Arkansas, show that a marriage license and certificate of marriage were issued on June 9, 1919, to Robert Spencer and Minnie Birdia, who were married the same day by a justice of the peace. Some months after the death of Bertha Spencer in 1948, at Robert Spencer's solicitation, the incumbent county clerk of Phillips County altered the record by deleting the name "Minnie" and by adding the name "Burns," so that it now appears that the license was issued to Robert Spencer and "Birdia Burns." No other license was ever issued to Robert Spencer in that county. It is suggested that the name "Minnie Birdia" appeared on the license as the result of a clerical error, and to bolster this theory appellees' witnesses testified that Bertha went by the name of "Birdie" while she lived in Arkansas, but all exhibited confusion as to just how the name was spelled. Witnesses for appellants denied that Bertha had been called "Birdie" and there was some testimony that there was a woman in that vicinity of Arkansas whose name was Minnie Birdia, the name appearing on the record copy of the wedding license. The only other evidence offered which throws any light on the discrepancy in names, was given by Rosemary Cooper, a friend of Bertha's in later years, who testified that in the early 1940's while the two women were discussing their marital status, Bertha expressed some doubt as to whether she was legally married because her "name wasn't right on the certificate."

As we interpret the record, Bertha and Robert separated late in 1919 or early in 1920 and did not again co-

habit. Both apparently moved to Chicago, at some time or another, for the next elements of proof, with respect to their marital status, are centered on conversations and occurrences in that city in about 1946. There is testimony that Bertha made some acknowledgment from time to time that she was married and not divorced, but the witness so testifying could not say that Bertha was referring to Robert Spencer. There was no evidence that Bertha had ever married or lived with another man, and it is undisputed that she went by the name of Bertha Spencer until she died. In 1946, Bertha was contemplating the purchase of some real estate and had some discussion about the matter with her friend Rosemary Cooper. When Bertha expressed the doubt about the validity of her marriage as related above, Rosemary suggested that she see an attorney and recommended Steven Tyrakowski. Apparently Bertha did not put the question of the marriage license to the lawyer, though she did retain him to represent her in the real estate transaction, for, by his testimony, she told him that she was divorced and the preliminary papers for the financing and transfer of the property described her as being divorced. A preliminary title opinion was rendered and as a result Tyrakowski notified Bertha that he would have to get the details of her divorce and was told that she was not divorced but expected to procure one. The attorney testified that Bertha then came to his office and told him the details of her marriage and that based on the information she gave him he made the following notation on the preliminary title opinion: "Married to Robert Spencer in Helena, Arkansas, on June 9, 1919." Following this, a different plan of financing Bertha's purchase was adopted and the necessary documents were redrafted without describing her marital status. An attorney named Montelione, who represented the seller, confirmed that Bertha's vacillation on her marital status had made it necessary to redraft the documents of sale. He stated that although Bertha told

him she was married and not divorced, he did not recall that the name of her husband had ever been mentioned to him.

There also appears in evidence testimony given in the probate court by both Will Burns and Isom Burns in which each stated that Bertha and Robert were supposed to have gotten married at Helena, Arkansas, in the spring of 1919, and that the two lived as husband and wife in the Burns home for the balance of the year.

Elizabeth Frowner, administratrix of Bertha's estate, was permitted to testify in this partition proceeding subject to objection, but at the conclusion of her testimony the master ruled that she was an incompetent witness and struck her testimony from the record. Robert Spencer made an attempt to testify, but was ruled to be an incompetent witness. He was, however, permitted to testify in rebuttal as to matters which had tended to connect him with a woman named Minnie Birdia.

Much of the evidence described was objected to by appellants and in this court they renew their objections to its admissibility on various grounds. The first contention made is that attorney Tyrakowski, Elizabeth Frowner and Robert Spencer, except for his rebuttal testimony, were incompetent witnesses for the reason that each are parties in interest in this cause. Appellee agrees that Robert Spencer was incompetent as a witness, the master so ruled and prevented him from testifying, thus there is no issue before us as to his competency. In like manner, the master held that Elizabeth Frowner was an incompetent witness and struck her testimony from the record. Appellee has assigned cross error asserting that she was competent as a witness; however, in the view we take of the evidence, no determination of her competency is necessary nor must her testimony be considered to arrive at the result we reach. There remains the question of Tyrakowski's competency as a witness. Though not clearly shown, we gather from the

record that Robert Spencer first sought Tyrakowski's services when this partition proceeding developed. The latter did not however, actively participate in litigation and, as was his custom, turned the matter over to a firm of attorneys with whom he had a limited association for such purposes. It was customary that Tyrakowski would receive a portion of the fee in the cases he turned over to the firm, but his testimony in this case was that he had waived any fee when it became apparent that he would have to be a witness. A further reason advanced for his incompetency is that he represents Elizabeth Frowner, the administratrix of Bertha Spencer's estate, who, having been nominated by Robert Spencer, will stand or fall from such position dependent on the outcome of this case, her status thus directly affecting the fees that Tyrakowski will receive in the administration proceeding. We do not believe that either ground is sufficient to disqualify. Attorney Tyrakowski stated that he had withdrawn from this case and waived any fee, and there is no proof to the contrary. His interest in the partition proceeding is therefore not direct, certain and immediate, and in such cases we have held that his interest, if any, merely goes to his credibility and not to his competency. (*Flynn* v. *Flynn,* 283 Ill. 206; *Bailey* v. *Beall,* 251 Ill. 577.) As regards Tyrakowski's representation of the administratrix and the possibility of his loss of employment and fees in the probate court, as rendering him incompetent in this proceeding, this court held in *Britt* v. *Darnell,* 315 Ill. 385, that such an interest was too remote and indirect to render an attorney incompetent to testify in his client's behalf in a collateral proceeding. In the *Britt case,* which was a will contest, the court said of the attorney who was held to be a competent witness although he represented the executor named in the will: "The fact that his client, as a result of the litigation, may lose some property and be less able to pay him fees or have less occasion to employ him does not give him such

an interest in the litigation as to make him incompetent to testify." Applying these authorities to the facts of this case, it is our conclusion that Tyrakowski was competent to testify and that the interest shown affects only the weight of his evidence.

It is next contended that the conversations between Bertha Spencer and attorney Tyrakowski, in which she revealed that she was married to Robert Spencer and not divorced, were privileged communications between a client and attorney and as such were not admissible in evidence. There are many exceptions to the "privileged communications" rule, one of which is that communications made by a client to an attorney for the purpose of being disclosed by him to others do not fall within the rule of privilege. (*Dickerson* v. *Dickerson,* 322 Ill. 492.) It will be recalled that Bertha Spencer communicated her true marital status to Tyrakowski for the specific purpose of meeting the objections made by the firm which rendered an opinion of title on the property she sought to purchase and finance. Under such circumstances, the conversations with her attorney, now claimed to be privileged, could only have been made for the purpose of allowing him to disclose the information both to the seller and to the title examiner. There was no thought or intention that the information given was to be safeguarded, but, rather, it was Bertha Spencer's purpose that the information be given to those persons whose objections barred her way to the purchase of the property. It cannot be said that such communications to her attorney were privileged communications within the rule and the master properly admitted them in evidence.

Claim is also made that the master erred in admitting in evidence the testimony which Will and Isom Burns had given in the probate court for the reason that they and the intervenors did not have a joint interest but a common interest. (See: *Cunniff* v. *Cunniff,* 255 Ill. 407.) We note from the record that the master struck the evidence of the

testimony of Isom Burns as to all parties but Isom Burns and made a similar ruling with respect to evidence of the testimony of Will Burns, allowing it to stand only as to the administratrix of the latter's estate. We do not find that the objection now made in this court was made when the evidence was offered, though several objections were made on other grounds. On review, we have held that specific objections to evidence, based solely on particular grounds, are a waiver of objections to all grounds not specified or relied upon. (*Village of Prairie du Rocher* v. *Schoening-Koenigsmark Milling Co.* 248 Ill. 57.) On the record before us, the objection now made is without force.

Appellants intimate that there is other objectionable evidence but profess that they do not wish to tire this court by itemizing it or citing cases in point. We shall further lighten our burden by considering the point waived. This court will not search the record for error, nor will we consider vague objections as to the admissibility of evidence.

Next to be considered is appellants' assignment of error that the evidence does not prove that Robert Spencer married Bertha Spencer. In advancing this contention it is urged that Robert has failed to sustain his burden of establishing the marriage, the identity of participants, or that the marriage met the requisites for a valid marriage under Arkansas law. Some stress is laid upon the points that there is no evidence of a marriage license having been issued to Robert and Bertha, or of the actual performance of a wedding ceremony. However, we find the rule to be in this jurisdiction, that in civil actions, except in actions for criminal conversation, marriage may be shown by reputation, the testimony of witnesses or by circumstances. (*Murrelle* v. *Industrial Com.* 382 Ill. 128; *Lowry* v. *Coster,* 91 Ill. 182.) Thus, lack of proof of the elements complained of is not fatal to appellees' case. While there is conflict as to the reputation of Robert and Bertha's relationship and as to the circumstances which preceded and

followed it, the issue becomes one of the credibility of the witnesses, and it has been repeatedly held that such a determination is best made by the master, jury or judge who hears the witnesses.

As we view it, proof of the identity of the parties and proof of compliance with Arkansas law are interdependent on the same evidentiary facts, which are, in turn, also dependent upon the credibility of the witnesses. The master found that there was ample credible evidence that the name Minnie Birdia was incorrectly set out in the wedding license and certificate, and that Bertha Burns was in fact the person described therein, the person to whom it was issued and the person to whom Robert Spencer was married on June 9, 1919. We are inclined to agree that the relationship of the parties immediately after that date and Bertha's retention of the name Spencer throughout her life, together with her uncontroverted acknowledgment that her name "was not right" on the wedding certificate, are circumstances which strongly outweigh the testimony which conflicts with such a conclusion. Accepting the identity of Minnie Birdia and Bertha Burns as being one and the same, it follows, from the further recitals of the certificate, which is to be construed as the best evidence of the fact, that the requirements of the Arkansas marriage law were complied with.

Considering the competent evidence and abiding by the credibility afforded to witnesses by the master and chancellor, we cannot say that the finding that Robert and Bertha Spencer were married is against the manifest weight of the evidence. Where the master has heard the testimony of the witnesses and made findings of fact based on the evidence, which findings are approved by the chancellor, this court will not disturb the decree unless it is manifestly against the weight of the evidence. (*Hopkins* v. *Austin State Bank,* 410 Ill. 67; *Finley* v. *Felter,* 403 Ill. 372.) We conclude that the court did not err in its decree which

awarded Robert Spencer one half the real estate being partitioned, as the surviving spouse of Bertha Spencer.

Immediately prior to the hearing on the exceptions made to the master's report, the administratrix of Will Burns's estate made a written motion to amend her answer to the supplemental complaint, to show the law of the State of Arkansas at the time of the alleged marriage. The chancellor's refusal to permit the amendment is assigned as error in this court. In essence the proffered amendment sought to bring before the court that common-law marriages are not recognized in Arkansas. In view of the master's finding that Minnie Birdia was Bertha Burns, together with the recitals of the marriage certificate in evidence which showed a valid marriage to Robert Spencer, we conclude that the chancellor did not abuse his discretion in refusing the amendment.

We now come to consider the issues raised by the appeal of Bertha Spencer's illegitimate half-brother and the grandchildren of her illegitimate half-sister, to whom we shall refer as intervenors. There is no factual dispute on this point. Carrie Burns and Will Burns were married and Bertha Burns and Isom Burns were their lawful issue. Carrie Burns predeceased her daughter Bertha, while, as we have seen, Will and Isom survived her. At the time Carrie married Will Burns, she had two children born out of wedlock, *viz.:* Columbus Hughes, who survived Bertha Burns Spencer, and Ophelia Helem, who predeceased her. Ophelia had married Dan Helem, and one son, Shirley Helem, was born to the union. Shirley Helem married Mary Helem and he too died before the death of Bertha Spencer, leaving as issue of his marriage, Shirley Mae Helem and Ronald Helem. None of the parties described ever adopted any child or children. Columbus Hughes, Shirley Mae Helem and Ronald Helem intervened in this cause, asserting that they are heirs of Bertha Spencer and entitled to a share of her estate. The master and chan-

cellor, however, construed our existing statute to hold that an illegitimate, or the descendants of an illegitimate, can inherit only from the mother and the maternal ancestors in an ascending line and not from the lineal descendants of the mother. The intervenors contend that this interpretation of the statute is incorrect.

The problem of an illegitimate's right to inherit reappears at this time in our jurisdiction because of apparent changes made by the legislature in section 2 of the Descent Act of 1872, (Ill. Rev. Stat. 1939, chap. 39, par. 2,) when that section was revised and consolidated in our current Probate Act, (Ill. Rev. Stat. 1951, chap. 3, par. 163,) which became effective January 1, 1940. The former act stated the right of an illegitimate to inherit in this language: "An illegitimate child shall be heir of its mother and any maternal ancestor, and of any person from whom its mother might have inherited, if living; and the lawful issue of an illegitimate person shall represent such person, and take, by descent, any estate which the parent would have taken, if living." The new enactment, which is found in section 12 of the Probate Act, (Ill. Rev. Stat. 1951, chap. 3, par. 163,) now describes the illegitimate's rights as follows: "An illegitimate child is heir of his mother and of any maternal ancestor; and in all cases where representation is provided for by this Act an illegitimate child represents his mother and his lawful issue represent him and take, by descent, any estate which the parent would have taken, if living." Noteworthy is the fact that the phrase which stated that an illegitimate was the heir of "any person from whom its mother might have inherited, if living" has been deleted from the new act, while there has been added the phrase which provides that "in all cases where representation is provided for by this Act, an illegitimate child represents his mother * * *."

The construction given by this court to the deleted phrase in such cases as *Morrow* v. *Morrow*, 289 Ill. 135,

*Chambers* v. *Chambers,* 249 Ill. 126, and *Bales* v. *Elder,* 118 Ill. 436, admits of no doubt that prior to the adoption of the Probate Act of 1940, the intervenors would have inherited from Bertha Spencer as lineal descendants of the common mother. Even though the phrase upon which the foregoing decisions were based has been deleted from the present statute, the intervenors urge that the new act is but a re-enactment of the old, without change in substance, and insist that it should receive the same construction as the old act. The trial court, however, interpreted the deletion and the terms of the new act as manifesting a legislative intent to now limit the illegitimate to the right to inherit only from his mother and from his maternal ancestors in an ascending line, recognizing that under the terms of the old act it had been held that an illegitimate could also inherit from the lineal descendants and collaterals of the mother.

That the substance and effect of the deleted and added provisions are not the same may be quickly demonstrated. The new provision for representation of the mother by an illegitimate cannot, by its own express terms, apply in cases where representation is not provided for in the Probate Act. The rule of descent applicable to the facts of this case where there is a surviving spouse, a parent, and a brother, (Ill. Rev. Stat. 1951, chap. 3, par. 162,) makes no provision for representation when one of the parents is deceased. Thus the new language added to section 12 has no application in this cause. On the other hand, under the old or deleted provision, the illegitimate was the heir of any person from whom the mother could have inherited, whether or not the device of representation could be used. As succinctly pointed out in a note found in 40 Ill. Bar Journal 289, the intervenors here could have claimed inheritance under the deleted provision, but they may not claim under the added provision. Whether intended or not, it is apparent that there are substantial differences between

the two acts and that the later act is not a mere re-enactment of the former act.

Since neither the added nor deleted provisions can now assist the intervenors, it follows that their present right to inherit must depend on the construction to be given the concluding words of the phrase: "An illegitimate child is heir of his mother *and of any maternal ancestor;*" (emphasis is ours.) Though the "maternal ancestor" phrase is common to both the old and new acts, we do not find that it has ever been construed or interpreted by this court. Rather, in all the cases we have examined, the phrase deleted from the new act served as the basis for holding that an illegitimate was heir of lineal ascendants, lineal descendants and collaterals of the mother. To reach the same result under the "maternal ancestor" phrase, the intervenors contend that the word "ancestor" has a special meaning when used in statutes of descent and suggest that as the word is used in the statute under consideration it refers to any person from whom the illegitimate's mother might have inherited if she lived. This was the construction placed upon "maternal ancestor" in *Calamia* v. *Dempsey,* 344 Ill. App. 503, 101 N.E. 2d 611, a decision this court was not called upon to review. However, because of the substantive changes produced by the new act, which the court refrained from recognizing, we are unable to agree with the result there reached.

While some jurisdictions, under statutes peculiar to them, have held that the term "ancestor," when used in the law of descent, is the correlative of the word "heir" so that the ancestor of a person is held to be one from whom that person inherits an estate, such interpretation appears to be the exception rather than the rule and we find no basis for its application in this jurisdiction. The common meaning of the word "ancestor," (and the sense in which it has always been employed in our law,) is, one who has preceded another in a direct line of descent, a lineal ascend-

ant. In the absence of any expression or indication to the contrary, we must hold that the legislature employed the term in its common meaning when section 12 of the Probate Act of 1940 was enacted. A similar interpretation was given the words "maternal ancestor" in *Pratt* v. *Atwood,* 108 Mass. 40, wherein the court, when called upon to interpret a statute almost identical with our own, made the following observations: "By the St. of 1851, c. 211, it was provided that every illegitimate child should be considered as heir to his mother and of any maternal ancestor, and that his issue might take by descent from such ancestor. * * * The words 'maternal ancestor' are manifestly limited to progenitors, or ancestors in the direct ascending line, according to their common meaning and the sense in which the word 'ancestor' is used throughout the statute of descents * * *."

Giving service to the common meaning of the words "maternal ancestor" and avoiding a tortured meaning to produce what might be a more desirable result, it is our opinion that the trial court properly concluded that, as section 12 of the Probate Act is now constituted, it manifests a legislative intent and direction that the right of an illegitimate to inherit is now limited to a right to take only from his mother and from her lineal ascendants. The conviction that the legislature employed the term "ancestor" in its ordinary sense, when coupled with knowledge of that body's deliberate action of deleting the phrase which previously made an illegitimate the heir of "any person from whom its mother might have inherited, if living," renders it difficult to reach any other result.

The intervenors argue with force that we should indulge in a liberal interpretation of the new enactment to the end that we give effect to the public policy reflected in legislation and judicial interpretation of the past, which seeks to remove the onus of illegitimacy from the unoffending children. While we recognize and approve the policy referred

to, it should be borne in mind that a policy of such nature is fixed by the legislature and found within its expressions and that it does not stem from the desires or manifestations of the judiciary. The liberal rule of construction urged upon us requires only that the statute be enforced as to carry into effect the will of the legislature as expressed by its terms. It is not within the province of this court to take from or enlarge the meaning of the statute by reading into it language which will, in the court's opinion, correct any supposed omission or defect. (*American Steel Foundries* v. *Gordon,* 404 Ill. 174.) Looking to the express terms of the new statute involved in this case, and with an eye to the comparative legal effects of the terms added to and deleted from the new enactment, it is our belief that the legislature has substantially departed from the expression of public policy contained in section 2 of the Descent Act of 1872 to such an extent that the terms of the new act do not admit of the same construction given the old act. If the departure from the former policy was unintentional, and there is nothing in the act to show that it was, it is for the legislature, not this court, to remedy the defect which the express terms of the act have created. We may liberally construe the policy expressed, but we may not alter it or add to it by our construction.

Significant too, is the fact that statutes conferring the right of inheritance upon an illegitimate are in derogation of the common law which considered him a *filius nullius* and the heir of no one. While section 9 of the Probate Act, (Ill. Rev. Stat. 1951, chap. 3, par. 159,) precludes the application of the rule that statutes in derogation of the common law shall be strictly construed, we are nonetheless bound to determine the legislative meaning and intent from the exact language by which the legislature expresses itself. Our analysis of the new enactment causes us to conclude that new limits have been fixed on the right of an illegitimate to inherit, namely, the right to inherit only from the

mother and from the lineal ascendants of the mother. Accordingly, we hold that the trial court properly found that the intervenors could not inherit from Bertha Spencer.

For the reasons stated, the decree of the superior court of Cook County is affirmed in all respects.

*Decree affirmed.*