STATE OF NORTH CAROLINA v. KATHY MATTHEWS JONES

No. 29

(Filed 11 November 1977)

**1. Criminal Law § 75.10— defendant's statements to police officers—admissibility**

In a prosecution of defendant for the murder of her child, the trial court properly admitted testimony as to statements made by defendant to police officers where evidence presented at a hearing of defendant's motion to suppress supported the following findings of fact made by the trial court: (1) the defendant's initial statement to the effect that an unknown intruder entered her trailer, shot the child while defendant lay asleep on a couch in the living room and then fled from the trailer was made to officers when they first arrived at the trailer and was made voluntarily; (2) when a deputy sheriff, shortly thereafter, took the defendant from the trailer out to his patrol car for an interview, he advised defendant of her constitutional rights in accordance with the *Miranda* formula; (3) the defendant affirmatively indicated that she understood her rights and was willing to make a statement and answer questions without an attorney being present; (4) repeatedly thereafter (on five separate occasions), as the interviewing process was resumed by officers following interruptions, defendant was given the *Miranda* warnings and signed written waivers of her constitutional rights; (5) the interviewing process was frequently interrupted and defendant on several occasions returned to her home or to the home of her parents; and (6) during other interruptions of the interviewing process, defendant was given food and drink and opportunities to retire to the rest room.

**2. Criminal Law § 112.6— refusal to instruct on insanity**

In this prosecution of defendant for the first degree murder of her three year old child, the trial court did not err in refusing defendant's request that he give the jury instructions with reference to insanity where defendant's defense at trial was not insanity but was that it was not she who shot and killed the child, defendant's expert psychiatrist testified that he had made no evaluation of defendant's sanity, and there was no evidence in the record to indicate that defendant was insane, the fact that the State's evidence tended to show that defendant committed a horrible, gruesome crime—the murder of her own sleeping infant daughter—not being evidence of insanity requiring the submission of that question to the jury.

**3. Criminal Law § 5— test of insanity**

The test of insanity as a defense to a criminal charge is whether the accused, at the time of the alleged act, was laboring under such a defect of reason, from disease or deficiency of the mind, as to be incapable of knowing the nature and quality of the act, or, if he does know this, was, by reason of such defect of reason, incapable of distinguishing between right and wrong in relation to such act.

**4. Criminal Law §§ 5, 112.6; Homicide § 28.7— refusal to charge on insanity— Fourteenth Amendment**

The Fourteenth Amendment of the U.S. Constitution is not violated by the rule in this State that, in the absence of any evidence of insanity, it is not error for the trial judge to refuse the defendant's request that he instruct the jury upon the law relating to insanity as a defense to a charge of murder.

**5. Criminal Law § 84; Constitutional Law § 21— evidence obtained by use of one-way mirror— unlawfulness— objection on another ground— harmless error**

The trial court in this homicide case did not err in permitting a police officer to testify concerning a statement made by defendant to her father in a conversation in an interview room at the sheriff's office, which conversation was overheard by the officer while observing the participants without their knowledge through a one-way mirror, although the evidence was unconstitutionally obtained, where defendant's objection to the evidence was made upon the ground that the witness was testifying "to the effect" of the conversation rather than to its precise words, and the stated ground for objection was invalid; furthermore, the admission of such testimony was harmless beyond a reasonable doubt in light of the proper admission of defendant's more detailed confession to the police, made immediately prior to the conversation in question, and defendant's incriminating statements made to her lover.

APPEAL by defendant from *McLelland, J.,* at the 13 December 1976 Session of WAKE, at which the defendant was convicted of murder in the first degree and sentenced to imprisonment for life.

The evidence for the State was to the following effect:

At approximately 2:30 a.m. on 27 February 1976, two deputies of the Sheriff of Wake County, in response to a telephone call for assistance, went to the trailer home of the defendant, a 25 year old white woman. They found the defendant's three year old daughter, Tonia, lying in the child's bed at the point of death as the result of three .22 caliber pistol bullets fired into her head at close range. The child died a few minutes after their arrival. The only other persons in the trailer when the officers arrived were the defendant and a female neighbor, who

had come in response to a call from the defendant and who had called the officers.

The defendant then told the officers that, after putting the child to bed, she went into the living room and lay down upon the couch and fell asleep. She was awakened by shots, following which she heard someone, not seen by her, go out the *back* door, whereupon she ran into the child's room, observed the child and then went into her own bedroom to get her pistol but found it missing from the place where she kept it.

The defendant's .22 caliber, six shot revolver was found on the bottom back step of the trailer. It contained three live rounds of ammunition and three shell casings from which the bullets had been fired. In the opinion of a ballistics expert, two of the three bullets removed from the child's head in the course of an autopsy were fired from this pistol, the third bullet bearing some characteristics of a bullet so fired but not enough to make a positive determination.

A bloodhound, promptly called by the investigating officers to the scene, was unable to pick up a scent. The back steps of the trailer were in such bad condition that care had to be used in descending them.

After the investigating officers requested the defendant to allow them to make a test for the presence of gunshot residue upon her hands, she told the officers she had fired her pistol at target practice in her backyard that afternoon. Shortly thereafter, she told them that, following her discovery of the wounded child, she observed the pistol on the floor of the trailer corridor, kicked it out of the back door and then, while hysterical, picked it up and fired it one time.

There was no evidence of a forcible entry of the trailer. The only finger or palm prints found on the frame of the rear door of the trailer and on the nearby wall were those of the defendant and David Stephenson, a married man separated from his wife, who had been living in the trailer with the defendant for several days preceding the shooting but who had departed several hours prior thereto. No fingerprints were lifted from the pistol.

The defendant told the officers she had heard prowlers about her trailer on other occasions and that she had previously so in-

formed the sheriff's office of this by telephone. The sheriff's office had no record of such complaint by her.

The defendant was married to Joel Turner when she was 16. By that marriage she had a son named Timmy. That marriage ended in divorce. She then married Tony Jones, the father of Tonia. Thereafter, Timmy was run over by an automobile and rendered permanently and completely helpless. The defendant being physically unable to care for him regularly, Timmy has lived, since his injury, with her parents.

The defendant's second marriage was an unhappy one and she and Jones separated two years after the birth of Tonia. Shortly thereafter, Jones came to the home of the defendant's grandmother, where the defendant and Tonia were then living, and, while there, was killed by four gunshots. The defendant told the officers that he was killed in a struggle with her grandmother after Jones had drawn a gun from his pocket, pointed it at the defendant and stated he was going to kill her and Tonia. The defendant's relations with her Jones in-laws were not pleasant, they being of the opinion that she had killed Jones.

Soon after her marriage with Jones, the defendant was manager of the toy department at Woolworth's store in the North Hills Shopping Center in Raleigh. Later, she assisted Jones in his business. Following his death, she drew Social Security and veteran's compensation benefits as his widow and the mother of his minor child. After his death, she purchased for $10,000 the trailer in which she and Tonia were living when the child was killed.

As a result of the accident to her son Timmy, the defendant received a settlement payment for Timmy's benefit. Since he was being cared for by her parents, the defendant used part of this settlement money to buy the trailer, to buy a car, to buy herself a diamond ring and to buy clothing and other things for Tonia.

Approximately six weeks prior to the shooting of Tonia, the defendant was negotiating for the purchase of a house for $42,500, telling the realtor handling the sale that she intended to pay for it by the sale of her property plus funds from an insurance policy in the amount of $40,000 upon the life of Jones. In November, 1975, the defendant sought assistance from the State Commissioner of Insurance in the collection of this policy, the company

having refused to pay on the ground that it had lapsed for non-payment of premiums. In December, approximately two months prior to the shooting of Tonia, the Insurance Department advised the defendant that, in all probability, the policy was not going to be paid unless she could produce proof that the premiums had been paid.

In April, 1975, nearly a year prior to the shooting of Tonia, the defendant applied for and procured a policy of insurance on the life of Tonia in the amount of $30,000, payable to the defendant, at the same time taking a similar policy on her own life. Three months thereafter, she applied to a different company for another policy of $20,000, payable to herself, on Tonia's life. No policy was issued on that application because the defendant failed to submit a necessary report to the company. Thereafter, on 5 November 1975, the same date on which she sought aid of the Commissioner of Insurance with reference to the policy upon the life of her husband, Tony Jones, the defendant reapplied for such policy upon the life of Tonia, stating in this application that there was no other insurance on the child.

On the evening of February 26, a few hours prior to the shooting of Tonia, as Stephenson was preparing to leave the trailer to return to his own apartment for the night, the defendant, expressing regret that he was leaving, said, "I feel like I have been burdened with children all my life and there is [sic] just some things I want to do." When Stephenson returned to the trailer after the shooting, he began to cry. The defendant put her arms around him and told him not to cry, saying she needed him and, "That is the last of Tony." Stephenson never saw her cry or give any other indication of being upset concerning Tonia's death.

From the time of the first officers' arrival at the trailer at 2:30 a.m. on February 27 until approximately 6:00 p.m. on March 4, the various investigating officers talked with and questioned the defendant on numerous different occasions, she being in their presence for a total of about 39 hours, including numerous interruptions of the interviews.

During a subsequent interview, she told the officers that she did not know if she had fired the gun when she came upon it after discovering the wounded child. In a still later interview on March 3, the officers told the defendant they had interviewed Stephen-

son and had taken "three empty casings from his gun." The defendant looked a bit startled, paused for several minutes, and then told the officers that Stephenson shot the child, that she, herself, had been struck on the head, had heard shots, had heard Tonia scream, had seen Stephenson come from that area of the trailer and walk through the living room, get in his car and leave. She told the officers that Stephenson knew about the insurance on Tonia's life and, after Tonia was killed, Stephenson said to her: "Now Tony is really gone. All of him."

On the following day, March 4, the defendant again told the officers that Stephenson had killed the child. At that point, the officers brought Stephenson into the interview and she asked him if he did it. Stephenson told the defendant to tell the officers the truth and said that she was trying to cause him, Stephenson, to receive a life sentence for something he did not do. Thereupon, Stephenson and the officers left the interview for the giving of a polygraph test to Stephenson.

Following that interview on March 4, a warrant, charging the defendant with murder, was served upon her and read to her by the officers. At that point, Deputy Sheriff Munn entered the interview and asked the defendant if there was anything she wanted to tell the officers. He told her that the officers had "all the pieces to the puzzle except one and she had that one blocked out" and that Stephenson was not part of the puzzle.

When Deputy Munn asked the defendant to "come out with it," she stated, "I am trying." He then asked her, "Why did you shoot Tonia?" She replied, "I don't know." When asked again, she said, "I don't have a reason." Deputy Munn then asked, "How close were you when you fired the shots?" She replied, "Real close." He asked her, "Did you put the gun to Tonia's temple?" She replied: "Close to it. I don't remember all of it. I don't remember thinking anything. I don't know why I did it. Tonia didn't say anything. I don't remember what I did then. I kicked the gun out the door and remember picking myself up." She continued: "I remember shooting Tonia one time and I remember I could not stop shooting. I remember standing beside her bed. A lot of this, I guess I blocked it out. I'm sorry. Oh, God, I'm sorry." Again, she said: "I loved her. She was all I had. Back in my mind I don't know why I shot her. The only thing I can think of was may-be to save her from the life I have had. I didn't want her to

live in the same hell. I remember laying on the couch thinking about things which have been done to me in the past; heartaches and the pains. I guess I loved her too much. I wanted to spare her from the pain * * * I got up and went through the kitchen and into the bedroom where I got the gun. I went to Tonia's room and started shooting. I then went down the hall to the back door and kicked the gun out the back door. I fell. I then went back to Tonia's room and saw her and I screamed. I then went and locked the back door and called Linda [the neighbor who was present when the first officers arrived at the trailer]."

After the defendant was arrested and charged with the murder on March 4, Stephenson again talked to her with no officers present. He asked her why she had killed Tonia and she replied, "Because I didn't want to see Tonia hurt like I am hurt."

After the warrant was served upon the defendant and she was taken into custody, the officers left her in the interview room in the sheriff's office in the company of her father. Unknown to them, Deputy Stewart observed them through a one-way mirror and heard their conversation. No one else was present in the interview room with the defendant and her father. The defendant was crying when her father entered the room and said, in effect, "Kathy, you did it didn't you?" The defendant replied that she did. When her father asked her why, the defendant replied that she did not know. (Both the defendant and her father, who testified as a witness for her, denied that she made this statement, each saying that her statement was that the officers wanted her to say she did it but she did not.)

On at least six different occasions, scattered through the entire period of interviews from February 27 to March 4, the defendant was informed by the officers of her constitutional rights, pursuant to the Miranda formula, and on at least three different occasions she signed written waivers of those rights.

Initially, the investigating officers did not consider the defendant a suspect but became increasingly suspicious of her complicity in or responsibility for the murder of the child as inconsistencies appeared in her various statements and repetitions of her narrative of the offense. One of the officers who first arrived at the trailer took the defendant out to his patrol car and talked to her there because of the confusion in the trailer incident

to the investigation. This interview was interrupted several times. He gave her the "Miranda warning" after she told him she had fired the pistol once when she found it on the ground behind the trailer, he knowing there were only three spent shells in the revolver and that there were three bullets in the child's head.

Subsequently, this officer took the defendant to the sheriff's office in order to obtain a recorded statement. He and succeeding investigators then interviewed the defendant several times throughout the day, February 27. There were frequent interruptions of these interviews and the defendant had access to water and the rest room, smoked at will and was offered food and coffee, which she declined.

For one of these interviews, late in the afternoon, the officers took her back to her trailer. She fixed herself a "mixed drink" and offered to fix like drinks for the officers, which offer they declined. She went through the trailer with them and into the child's room. She sat on the child's bed, the covers of which were heavily stained with blood. She showed no emotion whatever. (In her own testimony the defendant flatly contradicted this testimony of the officers and said that one of them forced her face down into the blood-stained covers. This the officers, called in rebuttal, categorically denied.)

In between the various interviews with the officers, scattered over the entire week, the defendant was permitted to return to her trailer, or to the home of her parents, and, on at least one occasion, she and Stephenson went to his apartment. During part of the interviews her parents and sister were also in the sheriff's outer office and, between interviews, she talked with them.

On February 28, the officers followed the defendant to the funeral home and into the room where she was arranging her child's hair for burial. When she demanded that they leave, they did so. They also attended the child's funeral on February 29 to observe the defendant's demeanor. According to the officers, she showed very little emotion at the funeral. The officers did not interview the defendant on February 29, March 1 or March 2, she being with her parents in their home.

While interviewing the defendant in the child's bedroom on February 27, as she sat on the bloodstained bed, the officers,

observing her lack of emotion, began to consider her a definite suspect and their interrogations became more vigorous. Nevertheless, she admitted nothing implicating her in the shooting, saying to the interrogating officer: "I haven't admitted anything. I need time to think." The officer then told the defendant he did not believe things had happened the way she told it and did not believe any intruder had come into the house and shot Tonia. She then requested time to take a bath and think. She was permitted to do so.

Throughout all interviews until March 3, when she said Stephenson shot the child, she adhered to her original story that an unknown intruder had done the shooting. No threats or promises were made to the defendant, no one yelled at her, no one accused her of killing her daughter or told her that she was mentally ill in any of the various interviews scattered over the week.

The defendant's own testimony was to the following effect: She denied shooting Tonia, denied any lack of emotion concerning her death, denied making the alleged confession to which the officers testified and charged the officers with harassment of her by making her sit upon the child's bloodstained bed, pushing her face down upon the blood stains, and showing her photographs of the child's body. To the best of her knowledge, the doors of the trailer were locked when she lay down on the couch prior to the shooting. She was lying there hoping that Stephenson would return and she fell asleep. The next thing she remembers is "something coming toward my face" like a cloth. She does not know if she was struck or if anything was put up to her nose. The next thing she remembers was some strange noise. She tried to get up but was unable to do so. She then saw a man "coming at an angle going through my kitchen out my *front* door," who said: "Now, Tony is dead. All of Tony is dead now." In her testimony she did not identify this man as Stephenson. She then ran to the child's bedroom, saw the wounded child and went to get her gun but it was not in her own bedroom where she kept it. As she passed the child's bedroom again, she saw the gun lying in the hallway. She opened the back door and kicked the gun out of the back door, her reason for doing so not being known to her. She positively did not shoot the child.

The defendant's parents and a number of her neighbors, including some who were called as witnesses for the State, testified

to the defendant's affectionate care of Tonia and to her definite display of emotion during the week following the child's death.

Dr. Robert Rollins, an expert psychiatrist, called as a witness for the defendant, testified that, in his opinion, the defendant was under "extreme stress and duress" throughout the course of the interrogation, saying: "It seems to me that the major stressful points would be that she was required to remain alone on occasions. She asked to leave, was not allowed to. There was repeated questioning. The situation was confusing to her; she was required to go into Tonia's bedroom; she was shown photographs; there were intimidating statements, promises made, false assurances, false information, statements about God; the absence of female deputies; the continued interrogations; the failure to inform her of the limits of the restraint and the actual intent of the process. These, I would judge to be the major stressful factors." This testimony by Dr. Rollins was predicated upon his having heard the testimony of the other witnesses, including the investigating officers, and was in response to a lengthy hypothetical question which is not set forth in the record but which the record states, "reviewed the facts of the case as set forth in this record."

Dr. Rollins then testified:. "My evaluation of facts that you have put forth would be that this degree of stress would substantially impair the defendant's judgment and reasoning; that she would not be able to make a valid statement and my assessment of the process is that her major motivation was to terminate this harassment and in my assessment at this point she would have done anything to terminate that process."

On cross-examination, Dr. Rollins testified: "I have made no evaluation of the sanity of the defendant. The conclusion I have reached is only as strong as the facts assumed in the hypothetical which took fifteen minutes to read in court. If those facts were in error then I would have to restate my assessment. I was assuming facts as stated on the information in the hypothetical which included promises on the parts of the officers, false assurances and a failure to inform her of the possible termination of this process including specifically the drawing of the warrant."

Prior to trial, the defendant moved to suppress the above mentioned evidence as to statements allegedly made by her, for the reason that such statements were obtained in violation of her

right to counsel and were not understandingly, voluntarily and intelligently made without coercion or duress. A full pretrial hearing upon this motion was conducted by Judge Godwin. At that hearing, the evidence for the State and for the defendant (including testimony by Dr. Rollins), concerning the length, nature and duration of the several interrogations of the defendant, was substantially in accord with the above summary of the evidence given before the jury concerning these matters.

At the conclusion of the pretrial hearing, Judge Godwin entered a formal order, including detailed findings of fact, these findings being substantially in accord with the testimony of the investigating officers. Upon these findings, he concluded that, on the occasion of each interview, the defendant was advised of her constitutional rights and that all statements of the defendant, both those which were inculpatory and those which tended to be exculpatory, were made after she was so advised and that these were made freely, understandingly, knowingly, and voluntarily, with full knowledge of her constitutional rights. Accordingly, Judge Godwin concluded that her statements to the officers were legally competent to be received in evidence and denied the motion to suppress.

*Rufus L. Edmisten, Attorney General, by John R. B. Matthis, Special Deputy Attorney General, for the State.*

*Joseph B. Cheshire V and William J. Bruckel, Jr., for Defendant Appellant.*

LAKE, Justice.

[1] The defendant's first contention on appeal is that there was error in admitting testimony as to statements made by the defendant during periods of custodial interrogation. In this we find no merit.

The defendant's motion to suppress evidence of all such statements made by her was heard, prior to trial, by Judge Godwin, at which hearing both the State and the defendant presented evidence. As to the statements so made by the defendant and the circumstances and conditions under which they were made, there is no substantial variance between the evidence so introduced at the pretrial hearing on the motion to suppress and that introduced before the jury at the trial.

At the conclusion of the hearing of the motion to suppress, Judge Godwin made numerous and detailed findings of fact. Each of these findings is fully supported by evidence so offered at the hearing. Although the testimony so given by the investigating police officers and that so given by the defendant conflicted in some respects, in such a situation the findings made by the hearing judge and so supported by evidence are conclusive on appeal. *State v. Thompson*, 287 N.C. 303, 317, 214 S.E. 2d 742 (1975); *State v. Blackmon*, 284 N.C. 1, 9, 199 S.E. 2d 431 (1973); *State v. Gray*, 268 N.C. 69, 78, 150 S.E. 2d 1 (1966), *cert. den.*, 396 U.S. 934, 90 S.Ct. 275, 24 L.Ed. 2d 232; Strong, N.C. Index 3d, Criminal Law, § 76.10.

These findings of fact included the following (summarized and renumbered): (1) The defendant's initial statement to the effect that an unknown intruder entered the trailer, shot the child while the defendant lay asleep on a couch in the living room and then fled from the trailer was made to the officers when they first arrived at the trailer and was made voluntarily; (2) when Deputy Stewart, shortly thereafter, took the defendant from the trailer out to his patrol car for an interview, he advised the defendant of her constitutional rights in accordance with the Miranda formula; (3) the defendant affirmatively indicated that she understood her rights and was willing to make a statement and answer questions without an attorney being present to advise her; (4) repeatedly thereafter (on five separate occasions), as the interviewing process was resumed by the officers following interruptions, the defendant was again so advised of her constitutional rights pursuant to the Miranda formula and signed written waivers thereof; (5) the interviewing process was frequently interrupted and the defendant on several occasions returned to her home, or to the home of her parents, no interviews taking place on February 29, March 1 or March 2; (6) during other interruptions of the interviewing process, the defendant was offered, and given, food and drink and opportunities to retire to the rest room.

These findings of fact fully support the conclusions of the hearing judge to the effect that: (1) The defendant was not in custody at the time of her initial statement to the officers shortly after their arrival at her trailer home; (2) all statements by the defendant to the officers, both inculpatory and exculpatory, were made after she was advised of her constitutional rights and were

"freely, understandingly, knowingly, and voluntarily made with full knowledge" of such rights, which rights she "at those times knowingly, understandingly, and voluntarily waived." These conclusions further support the final conclusion of the hearing judge that the statements made by the defendant to the officers "are legally competent to be received in evidence against the defendant upon her trial." Consequently, there was no error in admitting the officer's testimony concerning these statements.

[2] The defendant's second contention on appeal is that the trial court erred in failing to give to the jury instructions with reference to insanity, though requested to do so by the defendant. In this contention we find no merit.

A careful study of the entire record reveals no evidence whatever to indicate that the defendant was insane. Her defense at the trial was not insanity but was that it was not she who shot and killed the child. Dr. Rollins, the expert psychiatrist called as a witness in her behalf, expressly testified, "I have made no evaluation of the sanity of the defendant." The fact that the defendant, if the evidence for the State be true and the verdict of the jury be correct, committed a horrible, gruesome crime, the murder of her own sleeping, infant daughter, is not evidence of insanity requiring the submission of that question to the jury.

[3] It is thoroughly established in the law of this State, by numerous decisions of this Court, that the test of insanity as a defense to a criminal charge is whether the accused, at the time of the alleged act, was laboring under such a defect of reason, from disease or deficiency of the mind, as to be incapable of knowing the nature and quality of the act, or, if he does know this, was, by reason of such defect of reason, incapable of distinguishing between right and wrong in relation to such act. *State v. Cooper*, 286 N.C. 549, 569, 213 S.E. 2d 305 (1975); *State v. Humphrey*, 283 N.C. 570, 196 S.E. 2d 516 (1973); *State v. Johnson*, 256 N.C. 449, 452, 124 S.E. 2d 126 (1962); *State v. Swink*, 229 N.C. 123, 47 S.E. 2d 852 (1948). There is no evidence whatever in this record that the defendant was, at the time her child was shot, laboring under any disease or deficiency of the mind, or defect of reason, or that she did not comprehend the nature and quality of her act, or that she was incapable of distinguishing between right and wrong in relation thereto.

As Justice Ervin, speaking for this Court, said in *State v. Swink*, supra, "Since soundness of mind is the natural and normal condition of men, everyone is presumed to be sane until the contrary is made to appear." In the absence of any evidence whatever tending to rebut this presumption, it is not required of the State that it offer evidence to establish the defendant's sanity and it is not incumbent upon the trial judge to instruct the jury with reference to this matter.

"G.S. 1-180 requires only that the trial judge declare and explain the law '*arising on the evidence*' with respect to all substantial features of the case." *State v. Brower*, 289 N.C. 644, 657, 224 S.E. 2d 551 (1976). (Emphasis added.) "The judge is not required to instruct the jury, except on the law of the case." *State v. McKeithan*, 203 N.C. 494, 166 S.E. 336 (1932). "The chief purposes of the charge are clarification of the issues, elimination of extraneous matters, and declaration and application of the law *arising upon the evidence*." *State v. Jackson*, 228 N.C. 656, 46 S.E. 2d 858 (1948). (Emphasis added.) With special reference to the matter of insanity, Justice Bobbitt, later Chief Justice, speaking for this Court in *State v. Mercer*, 275 N.C. 108, 114, 165 S.E. 2d 328 (1968), overruled on other grounds in *State v. Caddell*, 287 N.C. 266, 215 S.E. 2d 348 (1975), said, "It is, however, error to instruct the jury as to legal principles unrelated to the factual situation under consideration." In *Childress v. Motor Lines*, 235 N.C. 522, 530, 70 S.E. 2d 558 (1952), Justice Johnson, speaking for the Court, said, "[I]t is an established rule of trial procedure with us that an abstract proposition of law not pointing to the facts of the case at hand and not pertinent thereto should not be given to the jury."

[4] In *Patterson v. New York*, 97 S.Ct. 2319, 53 L.Ed. 2d 281 (1977), the Supreme Court of the United States held a New York statute "burdening the defendant in a New York State murder trial with proving the affirmative defense of extreme emotional disturbance as defined by New York law" does not violate the Due Process Clause of the Fourteenth Amendment of the Constitution of the United States. It necessarily follows that such provision of the United States Constitution is not violated by our rule that, in the absence of any evidence of insanity, it is not error for the trial judge to refuse the defendant's request that he instruct the jury upon the law relating to insanity as a defense to the charge of murder.

[5]   The defendant's third contention on appeal is that she is en-
titled to a new trial because the trial court permitted a police of-
ficer, called as a witness for the State, to testify concerning a
statement made by the defendant to her father in a conversation
between them in the interview room at the sheriff's office, which
conversation, unknown to the defendant and her father, was
observed and heard by the witness, then in another room,
through a one-way glass giving him a view of the interrogation
room and the opportunity to hear what was said therein.

After the defendant had been formally arrested and charged
with the murder and had orally confessed to the investigating of-
ficers that she shot and killed her daughter, the officers left her
alone in the interrogation room and then permitted her father to
join her there. The only reference in the entire record to this con-
versation is the following:

"Q. On the date she was charged and after she had been
served with a warrant [immediately following which she
made her confession to the investigating officers], did you
have occasion to observe the defendant and her father, Mr.
Matthews, together?

A. Yes, sir, I did.

Q. And where were they at that time?

A. They were in the interview room in the sheriff's of-
fice.

Q. And where were you?

A. I was in a view room which is located next to it.

Q. There is a one-way glass in between, is there not?

A. Yes sir, there is.

Q. Could you see both of them and hear both of them?

A. Yes sir, I could.

Q. Did they have any conversation?

A. Yes sir, they did.

Q. Was anyone else present in the room with them?

A. No.

Q. Would you describe that conversation?

A. I did not write down the conversation. It went something to the effect—Kathy was crying—

MR. CHESHIRE [defendant's counsel]: Objection *to something to the effect*. (Emphasis added.)

COURT: Overruled.

### EXCEPTION NO. 9

A. Kathy was crying. Her father entered the room and her father said *something to the effect*, Kathy, you did it, didn't you? Possibly not the right word but *something to that effect*. (Emphasis added.)

MR. CHESHIRE: Objection and move to strike.

Q. What was her response?

COURT: Objection overruled. Motion denied.

### EXCEPTION NO. 10

Q. What was her response, if any?

A. Her response was that she did.

MR. CHESHIRE: Objection and move to strike.

COURT: Overruled.

### EXCEPTION NO. 11

Q. Did the conversation continue?

A. Yes sir. Her father said to her, asked her why. She said she didn't know. Her father told her that if she did not want the child, that she knew that the child had a home; that she could have carried the child to their house.

Q. Now, none of these questions or answers in this conversation you have just described were in response to any questions by any law enforcement officer, were they?

A. There were none present in the room.

Q. All right, sir. And there were no questions by law enforcement officers which invoked them that you saw?

A. No."

State v. Jones

It is apparent from the record that the ground for the defendant's objections to this evidence was that the witness was testifying "to the effect" of the conversation rather than to its precise words. It is well settled that "evidence admitted without objection, though it should have been excluded had proper objection been made, is entitled to be considered for whatever probative value it may have," and the judge is not required to exclude it. Stansbury, North Carolina Evidence (Brandis Rev.), § 27. It is equally well settled that, "although a general objection to obnoxious evidence will be sustained when no ground has been assigned, if upon any ground it ought to have been rejected, yet when the ground of the objection can be fairly inferred from the record as understood by the parties at the time, another cannot be assigned in the reviewing court." *State v. Cumber*, 280 N.C. 127, 131, 185 S.E. 2d 141 (1971); *Pratt v. Bishop*, 257 N.C. 486, 126 S.E. 2d 597 (1962); *State v. Wilkerson*, 103 N.C. 337, 9 S.E. 415 (1889); *Gidney v. Moore*, 86 N.C. 484 (1882); *Vredenburgh Saw Mill Co. v. Black*, 251 Ala. 302, 37 So. 2d 212 (1948); *Spencer v. Burns*, 413 Ill. 240, 108 N.E. 2d 413 (1952); *Monroe Loan Society v. Owen*, 142 Me. 69, 46 A. 2d 410 (1946); *Kroger Grocery & Baking Co. v. Harpole*, 175 Miss. 227, 166 So. 335 (1936); Strong, N.C. Index 2d, Trial, § 15; Stansbury, North Carolina Evidence (Brandis Rev.), § 27; 1 Wigmore on Evidence (3d Ed.), § 18, p. 339; 75 Am. Jur. 2d, Trial, § 167; 88 C.J.S., Trial, § 125b. The stated ground for the objection by the defendant to this testimony was not valid and, considering the objection on that ground alone, there was no error in overruling it.

Furthermore, the admission of this evidence was harmless, beyond a reasonable doubt, in view of the fact that the evidence of the defendant's much more detailed confession to the police officers, made immediately prior to the conversation here in question, was properly admitted and, in addition, the defendant's lover, David Stephenson, testified as follows:

"After the warrant was served on her Thursday, March 4th, I talked to her with no officers present. I walked in and Kathy was crying and she grabbed me and I held onto her and we just held each other and I said, 'Why, Kathy? Why?' I said, 'Was it because of me?' And she stated, 'David, I don't want to hurt you no more,' and paused and I said, 'Why?' She

said, 'Because I didn't want to see Tonia hurt like I am hurt.' "

Nothing in the record indicates that the conversation between the defendant and Stephenson was induced or monitored, or otherwise overheard by any police officer.

In view of these two properly admitted confessions, it is inconceivable that the verdict of the jury would have been otherwise had the evidence of the conversation between the defendant and her father not been introduced. Thus, even if a proper ground for objection had been stated by the defendant, we conclude that the admission of this evidence was harmless beyond a reasonable doubt and the defendant is not entitled to a new trial on that account. *State v. Knight*, 282 N.C. 220, 192 S.E. 2d 283 (1972); *State v. Cox*, 281 N.C. 275, 188 S.E. 2d 356 (1972); *State v. Hudson*, 281 N.C. 100, 187 S.E. 2d 756 (1972), *cert. den.*, 414 U.S. 1160, 94 S.Ct. 920, 39 L.Ed. 2d 112; *State v. Brinson*, 277 N.C. 286, 177 S.E. 2d 398 (1970).

We are not to be understood as condoning this unfair tactic of the investigating officers. Although the defendant had already been arrested and charged with the murder of her child and, thereafter, had confessed to the investigating officers that she was the person who shot and killed the child, when the officers, thereupon, ostensibly withdrew and sent the defendant's father into the room, the defendant had a "reasonable expectation of privacy" throughout her conversation with her father. *See: United States v. Dionisio*, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed. 2d 67 (1973); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed. 2d 889 (1968); *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed. 2d 576 (1967). The State was ill-advised in introducing this unfairly obtained evidence so totally unnecessary to the conviction of the defendant. However, since it was so clearly an unnecessary, and so harmless, addition to properly admitted evidence of her confessions and since the defendant's objection to its introduction was not made upon the ground that the evidence was unconstitutionally obtained, the ruling of the trial court is not basis for granting the defendant a new trial.

The defendant's other assignments of error set forth in her statement of her case on appeal not having been brought forward into her brief and no argument or authority in support thereof be-

ing set forth therein are deemed abandoned. Rule 28(a) of the Rules of Appellate Procedure, 287 N.C. 741. Nevertheless, in view of the serious nature of this alleged offense, we have carefully reviewed the entire record, including the abandoned assignments of error, and find therein no error which would entitle the defendant to a new trial. The defendant was represented at her trial by able and diligent counsel, employed by her, which counsel was then appointed by the trial court to represent her on appeal, she being then found indigent. She has received able, diligent and vigorous representation, both in the trial court and in this Court. She was found guilty of the murder of her child by a jury, eleven members of which were women. She has had a fair trial, free from prejudicial error.

No error.