| DATE OF VIOLATION | MO | DAY | YR | MILITARY TIME | DATE OF ISS |
|---|---|---|---|---|---|
| | 4 | 27 | 77 | 0235 | 4-27-7 |

| LOCATION OF VIOLATION | DIST/PL | | CITY/TOWN | CODE |
|---|---|---|---|---|
| | 88 | | CUMBERLAND | |

TITLE 29 SECTION 1312 ☒ARREST ☐SUMMONS

| Alleged Speed ___ mph | Posted Speed ___ mph | Radar 162 | Clock 161 | Vascar 167 | Aircraft |
|---|---|---|---|---|---|

Exceeding Speed Limit ☐1251, ☐1252
☒1312 Operating under influence §1312 ☐1173 Failure to stop at red t SPt §921A
☐1116 Inspection sticker violation §2122 ☐1415 Operating after suspension
☐1412 Operating without a license 1531 ☐FR, §787-7 ☐CR, §c184
☐1171 Failure to stop at stop sign §949 ☐1463 Unnecessary noise §1a2

VIOLATION OPERATING UNDER THE
INFLUENCE OF INTOXICATING
LIQUOR

ISSUING OFFICER'S SIGNATURE _____
DEPT CUMB P.D. TROOP ___ CODE ___

The undersigned states that he has just and reasonable grounds to believe, and does believe, that the person named above committed the violation herein set forth, contrary to law.

_____ Robert E. Chandler
Sworn to and Subscribed Before Me CUMBERLAND P.D.
THIS 12th DAY OF July 1977
_____ DEPARTMENT

☐Personal appearance not required, if you comply with instructions on reverse side of this complaint
☒I promise to appear at the District Court at the time and on the date and at the place shown below to answer this citation. 142 Federal St., Portland

MAY 17 1977 9 A.M. 774-6276
Date       Telephone Number

Failure to comply with the above may result in suspension of your driver's license. Failure to sign this complaint will constitute a separate offense. Failure to appear or sign a waiver as instructed above is a criminal offense.

_____ David C. Pomeroy, Esq.
COMPLAINT

## Alphee CHENARD, Jr.

### v.

## MARCEL MOTORS.

Supreme Judicial Court of Maine.

June 2, 1978.

Marshall, Raymond & Beliveau by Paul
R. Dionne (orally), Lewiston, for plaintiff.

Rocheleau & Fournier, P. A. by Ronald P. Lebel (orally), Lewiston, for defendant.

Before DUFRESNE, C. J., and POMEROY, WERNICK, ARCHIBALD, DELAHANTY and GODFREY, JJ.

DELAHANTY, Justice.

On Sunday, October 6, 1974, the Lewiston Lodge of Elks sponsored a golf tournament at the Fairlawn Country Club in Poland, Maine. The defendant, Marcel Motors, an automobile dealership, was asked to donate an automobile as a prize. To promote its business, the defendant accepted the proposal and agreed to give any golfer who shot a hole in one a new 1974 Dodge Colt. Fliers advertising the tournament were posted in the Elks Club and sent to potential participants. On the day of the tournament, an agent of the defendant drove a new 1974 Dodge Colt to the golf course and parked it near the clubhouse. One of the above-mentioned posters was placed conspicuously on the vehicle. The plaintiff, Alphee Chenard, Jr., registered for the tournament and paid the requisite entrance fee.[1] While playing the thirteenth hole of the golf course, and in the presence of the other members of his foursome, the plaintiff allegedly shot a hole in one. The plaintiff notified the defendant and requested his prize. Disbelieving the plaintiff, the defendant refused to tender the automobile and litigation ensued. An Androscoggin County Superior Court jury found for the plaintiff and awarded damages of $2,984.00. From this judgment, the defendant appeals. We deny the appeal.

## I.

In response to the plaintiff's complaint, the defendant interposed a defense *inter alia* of illegality. Both in Superior Court and on appeal, the defendant argues that the golf tournament was a form of gambling, viz., a prohibited "game of chance." Since the "contract" in which the defendant

promised to give an automobile in return for shooting a hole in one was illegal, it may not be enforced; "[t]he law leaves the parties to an illegal contract 'where it finds them.'" *Jolovitz v. Redington & Co.*, 148 Me. 23, 29, 88 A.2d 589, 592 (1952), *citing Conley v. Murdock*, 106 Me. 266, 76 A. 682 (1909), and *Groton v. Waldoborough*, 11 Me. 306 (1834).

At the time of the golf tournament, an anti-gambling statute and an anti-lottery statute were in effect[2] as evidenced by 17 M.R.S.A. § 1803 which provides: "Whoever gambles, or bets on any person gambling, shall be punished by a fine . . ." and 17 M.R.S.A. § 2301 which reads in pertinent part: "Every lottery, policy, policy lottery, policy shop, *scheme or device of chance*, of whatever name or description, whether at fairs or public gatherings or elsewhere, and whether in the interests of churches, benevolent objects or otherwise, is prohibited." (emphasis supplied).

An exception to the anti-gambling and anti-lottery statutes exists in 17 M.R.S.A. §§ 330–346 which exception permits various nonprofit organizations to raise funds through the use of "games of chance" defined as

a game, contest, scheme or device in which a person stakes or risks something of value for an opportunity to win something of value and in which the outcome depends in a material degree upon an element of chance, notwithstanding that skill of the contestant or participant may also be a factor therein. 17 M.R.S.A. § 330(2).

Arguing from this definition, the defendant contends that the golf tournament constituted a scheme or device of chance prohibited under 17 M.R.S.A. § 2301 in which each participant risked something of value (the entrance fee) for a chance to win something of value (a new 1974 Dodge Colt), the outcome depending in a material degree upon

---

1. The record fails to make clear whether the entrance fee was $10.00 or $12.00.

2. These provisions have since been repealed. See note 10 *infra*.

an element of chance (shooting a hole in one).

Recognizing that a potential weakness in its argument is whether a participant "risked" his entrance fee, the defendant invokes prior case law. In *Lang v. Merwin,* 99 Me. 486, 59 A. 1021 (1905), the defendant owned a cigar store which contained a slot machine. Each nickel deposited in the machine would entitle a player to a five-cent cigar and, depending upon his luck, up to fifty extra cigars. Notwithstanding that the operator of the machine could not "lose," for at the very worst he would be entitled to a cigar worth the value of his play, the Court concluded that the device constituted gambling. Adopting what it referred to as the broadest possible definition of gambling, the Court found that

> it is not essential that both parties should stand to lose by chance; it is enough if one party stands to lose, or to win by chance. *Id.* at 488, 59 A. at 1022.

As long as the scheme contemplated the possibility of obtaining "something for nothing," *id.* at 489, 59 A. at 1022, it would be condemned as gambling. *Lang v. Merwin* was not an isolated decision, and its rationale was followed in *State v. Googin,* 117 Me. 102, 102 A. 970 (1918); *State v. Baitler,* 131 Me. 285, 161 A. 671 (1932), and somewhat more recently in *Jolovitz v. Redington & Co., supra.*[3]

Applying the *Lang* rationale, the defendant asserts that just as the customer in the cigar store on any given play could not lose and the store owner could not win, here the participant could not lose by chance for he would in any event be entitled to his round of golf and the defendant could not win by chance. Moreover, the underlying rationale of our prior cases, the possibility of obtaining something for nothing, was present in the case at bar for a meager entrance fee yielded the possibility of winning a new automobile. Since the case is on all fours with *Lang,* the defendant asserts that the scheme must be struck down as gambling.

We disagree.

■ It is true that the earlier-quoted portion of 17 M.R.S.A. § 2301, allegedly controlling, is the very language that was construed by *Lang* and its progeny.[4] A significant difference, however, is that when *Lang, Googin,* and *Baitler* were decided there were no exceptions to the lottery and gambling laws. Subsequent to these opinions, the Legislature has legalized pari-mutuel betting at harness[5] and running[6] horse racetracks, licensed beano games[7] and gambling[8] conducted by nonprofit organiza-

---

**3.** In *State v. Googin, supra,* the defendant's store contained a machine which would return a five-cent package of chewing gum for every nickel deposited and might deliver "trade checks" having a trade value in the store of five cents each. In *State v. Baitler, supra,* every nickel placed in the machine guaranteed a five-cent package of mints and the possibility of obtaining certain tokens which could be used in playing a type of pinball machine. In *Jolovitz v. Redington & Co., supra,* a participant basically received a stamp for every five dollars worth of merchandise purchased. By luck he might be able to match the insignia on the stamps with a like facsimile in a stamp book and thereby win certain prizes. Although *Lang, Googin, Baitler,* and particularly *Jolovitz* differ in some respects from one another, in each case the customer, for his consideration, always received merchandise worth an equivalent retail value and the possibility of obtaining additional winnings.

**4.** Following our State's separation from the Commonwealth of Massachusetts, the Legislature enacted an anti-gambling statute, P.L.

1821, ch. 18, and an anti-lottery statute, P.L. 1821, ch. 28. Recognizing that the lotteries afforded the State a significant source of revenue, the Legislature created an exception for lotteries authorized by state or federal law. By 1855, the exemption for both state and federally sanctioned lotteries had been repealed, and there appeared the first prohibition of a "scheme or device of chance." Subsequent amendments in 1857, 1877, and 1895 expanded the anti-lottery prohibitions so that well before the 1905 *Lang* decision the pertinent portion of 17 M.R.S.A. § 2301 had been codified. *State v. Bussiere,* 155 Me. 331, 154 A.2d 702 (1959); Seitzinger, *Gambling,* 28 Me.L.Rev. 37, 38–42 (1976).

**5.** 8 M.R.S.A. §§ 261–282.

**6.** 8 M.R.S.A. §§ 321–342.

**7.** 17 M.R.S.A. §§ 311–325.

**8.** 17 M.R.S.A. §§ 330–346.

tions, and a state-operated lottery.[9] These exceptions have riddled the gambling and lottery statutes to the point where it can no longer be said that it was "the intention of the legislature to prohibit every pecuniary transaction in which pure chance has any place." *Lang v. Merwin, supra* at 489, 59 A. at 1022.[10]

Juxtaposed with these cases is the black-letter explanation of the difference between illegal gambling or lotteries and legal competitions.

> [A]ccording to the definition of "wager," there must be two or more contracting parties, having mutual rights in respect to the money or other thing wagered or, as sometimes said, "staked," and *each of the parties necessarily risks something, and has a chance to make something upon the happening or not happening of an uncertain event.* But a purse or prize offered by a party, and to be awarded to the successful competitor in a contest in which such party does not engage, *nor has any chance of gaining, but only, perhaps, of losing, is without the element of a chance of gain or a risk of loss which characterizes the wager agreement.* *Misner v. Knapp,* 13 Or. 135, 139, 9 P. 65, 66 (1885). (emphasis supplied).

Although the above-quoted emphasized language may rub against the language in some of our former gambling opinions, there can be no gainsaying that this distinction accurately reflects the general state of the law. *Accord, Alvord v. Smith,* 63 Ind. 58 (1878); *Toomey v. Penwell,* 76 Mont. 166, 245 P. 943 (1926); *Las Vegas Hacienda, Inc. v. Gibson,* 77 Nev. 25, 359 P.2d 85 (1961); *Harris v. White,* 81 N.Y. 532 (1880). *See* Annot., 87 A.L.R.2d 649 (1963); 38 Am. Jur.2d *Gambling* § 264 (1968); 38 C.J.S. *Gaming* § 5 (1943).

◼ Beyond certain public policy considerations, it is said that a gambling contract is unenforceable because the promisor, if required to perform upon the happening of a stated event, will not have received anything of commensurate value with the performance which he himself renders, and the promisee will have suffered no detriment equal with the promisor's performance. 14 Williston, On Contracts § 1665 at 628 (3rd ed. 1972). As set forth in Restatement of Contracts § 520 (1932):

> A bargain in which a promisor undertakes that, upon the existence or happening of a condition he will render a performance
>> (a) for which there is no agreed exchange . . .
>
> · · · · ·
>
> is a wager and is illegal.

Similarly, a contract is unenforceable in a lottery situation where the promisee pays a definite sum in return for the promise of receiving a greater sum upon the happening of a certain contingency.

> [A]lthough there is sufficient consideration, there is no agreed exchange of performances. The only loss a buyer of ticket can suffer is the cost of it; and that is incurred when the bargain is made. *Id.,* comment b.

However, in a tournament, the promisee's performance of the requested act is the agreed exchange for the promised prize. 6A Corbin, On Contracts § 1489 at 656 (1962). The result is an enforceable unilateral contract. *Las Vegas Hacienda, Inc. v. Gibson, supra.*

◼ Payment of an entrance fee does not turn a legal competition into an illegal wager, at least where the fees do not make up the purse. *Toomey v. Penwell, supra; Las Vegas Hacienda, Inc. v. Gibson, supra; People ex rel. Lawrence v. Fallon,* 152 N.Y.12, 46 N.E. 296 (1897). Of course, labels will not bind the courts, and if the "entrance fees" collectively constitute a prize to be won by one of the contestants,

---

9. 8 M.R.S.A. §§ 351–367.

10. With the enactment of the Maine Criminal Code, *repealing* 17 M.R.S.A. §§ 1803 and 2301, the gradual devitalization of the gambling and lottery prohibitions was finally completed. Under the new law, social gambling is no longer penalized. The gambling provisions found in 17-A M.R.S.A. §§ 951–958 focus exclusively on professional and organized gambling activity. *See generally* Seitzinger, *supra.*

the scheme will be found to be a wagering transaction. *Porter v. Day,* 71 Wis. 296, 37 N.W. 259 (1888). A competition will also become a wager if the one offering the prize may compete to win it. In such a case, there is no agreed exchange of performances since the promisor has to pay nothing if he wins the contest, while each of the other contestants must render full performance regardless of whether the promisor wins. 6A Corbin, *supra* at 658–59. Combining these various factors, Restatement of Contracts, *supra* § 521, states:

> An accepted offer of a prize to the winner in a competition, success in which does not depend on a fortuitous event, is not a wager, if the promisor does not compete for the prize, or derive a profit or a chance of profit from payments by the contestants, and if entrance fees are not divided among the contestants.

In the instant case, the defendant did not compete for the prize. Moreover, the defendant derived neither a profit nor a chance of profit from the entrance fees paid by the participants. In fact, in an immediate sense, the defendant could only lose for it did not receive the fees which went to a third party not in privity with the defendant. Thus, the automobile was not offered by the defendant as a lure to separate individuals from their money for the defendant's gain. Finally, the sum total of the entrance fees was not divided among the contestants as in an office pool. The fees did not even constitute a portion of the prize; rather, the automobile as a prize existed entirely apart from the fees. It is clear, therefore, that the participants were not primarily risking their fees in the hope of making a return on their money as in a wagering transaction but were paying the fees for the privilege of participating in the tournament.

■ We conclude that the instant scheme was not violative of our gambling and lottery laws. *Accord, Las Vegas Hacienda, Inc. v. Gibson, supra,* (same fact pattern as the case herein). *See also State v. Prevo,* 44 Hawaii 665, 361 P.2d 1044 (1961), (defendant's contention that tournament constituted gambling labeled a "patent absurdity"). Consequently, when the plaintiff shot a hole in one, he accepted the defendant's offer of a unilateral contract thereby obligating the defendant to perform its promise.

To the extent that some of our prior decisions may be inconsistent with this opinion, they are accordingly modified.

## II.

In its answer, the defendant also asserted illegality because the tournament was played on Sunday and hence constituted a Sunday contract. On appeal, the defendant continues to urge illegality [11] and bases its claim on 17 M.R.S.A. § 3203 which provides in pertinent part:

> Any person who shall carry on or engage in the business of buying, selling, ex-

---

11. In its pleadings, it appears that the defendant was relying on the general prohibition of Sunday contracts, 16 M.R.S.A. § 353, a provision which it does not specifically refer to on appeal. Nevertheless, to the extent that we can construe its appeal as also based on the general prohibitory statute, we find it to be without merit. Section 353 of 16 M.R.S.A. states in pertinent part:

> No person who receives a valuable consideration for a contract, express or implied, made on the Lord's Day shall defend any action upon such contract on the ground that it was so made until he restores such consideration
> . . . .

Illegality is an affirmative defense. M.R.Civ.P. 8(c). Even under the modern rules of pleading, the defendant is required to allege that he returned the consideration. *Payson v. Cohen,* 158 Me. 297, 183 A.2d 510 (1962). This it did not do. That it was impossible to return the plaintiff's consideration of having hit a hole in one means that the affirmative defense of illegality, even if properly raised, would not have prevailed. In *Wheelden v. Lyford,* 84 Me. 114, 24 A. 793 (1891), the consideration was the use of the plaintiff's horses. The Court stated:

> The defendant cannot now defend this action of assumpsit on the ground of the contract having been made on Sunday until he restore that consideration. That he cannot restore it—that in the nature of things it is not restorable, does not relieve him. He need not have made the contract. Having made the contract and received the consideration he must either restore the consideration or abide the contract. If he cannot do the former he must do the latter. *Id.* at 116, 24 A. at 794.

changing, dealing or trading in new or used motor vehicles or mobile homes; or who shall open any place of business or lot wherein he attempts to or does engage in the business . . .; or who does buy, sell, exchange, deal or trade in new or used motor vehicles or mobile homes as a business on . . . Sunday, is a disorderly person.

The self-evident purpose of the statute is to prevent persons from engaging in the business of purchasing or selling motor vehicles or mobile homes on Sunday. The terms "exchange," "deal," or "trade" are methods by which an individual can buy or sell a motor vehicle.[12] The present situation does not, however, involve the transfer of an automobile for either money or property but concerns the winning of an automobile as a tournament prize. It plainly was not proscribed by 17 M.R.S.A. § 3203.

### III.

To prove his damages, the plaintiff testified as to the sticker price of the 1974 Dodge Colt parked at the golf course on the day of the tournament. Prior to testifying that the sticker price was $2,984.00, the following exchange occurred:

Q. (Plaintiff's Attorney)—Do you have an opinion as to the fair market value of that 1974 Dodge Colt?

A. (Plaintiff)—Yes, I can remember at the time looking at the sticker at the golf course—

(Defendant's Attorney)—I object.

(The Court)—Well, we have two problems here . . . not two problems, but, the witness has testified that he is in the automobile business. He hasn't been qualified beyond that point, but, there has been testimony as to the fact that he is a sales manager for some automobile company. Secondly, we are talking about a new car, and, this Court would take judicial notice, as I think is true, that all new cars, by law, are required to carry the list retail price of the vehicle, which certainly is evidence available to anyone who has actual knowledge of that sticker, and, the contents thereof, and, we're talking about a specific automobile—

(Defendant's Attorney)—May I just say this? I think this is where you and I probably will—*the automobile in question was not there. There was an automobile, but, that's not the automobile.* This is what—

(The Court)—Well, how did—your client, or you can make that explanation, but, at this point, this witness has testified that there at the golf course on the day in question, *there was an automobile, and, would not he be entitled to assume that that was the automobile that the Defendant was offering as a prize? Now, if it's not, then, that's something we haven't heard about yet.* The Court's position is that this witness has testified he observed the sticker on this particular vehicle, and, he recalls the stated retail price of that vehicle. He can testify to it, or, if you qualify him further, . . . he may give his opinion. (emphasis supplied).

On appeal, the defendant asserts that the presiding Justice erroneously overruled its

---

12. Generally, a transaction is a "sale" where there is a transfer of property for money and an "exchange" if property is exchanged for property. *Young v. Gerosa,* 11 A.D.2d 67, 202 N.Y.S.2d 470 (1960). *See Jordan Marsh Co. v. Comm'r,* 269 F.2d 453 (2nd Cir. 1959). A "deal" usually indicates the purchase, sale, or exchange of property for profit. Black's Law Dictionary 487 (4th ed. 1968). The term "trade" refers either to an exchange, *Colgan v. Farmers' & Mechanics' Bank,* 59 Or. 469, 114 P. 460 (1911), or a sale, *Speegle v. State Dep't of Insts.,* 198 So.2d 154 (La.App.1967). In the context of 17 M.R.S.A. § 3203, these terms appear to have a similar meaning. *Cf. Halquist v. State,* 489 S.W.2d 88 (Tenn.Crim. App.1972). (The terms "sell," "barter," and "trade" are alternative forms and means by which an illegal sale of drugs may be accomplished). *Barnard v. Barnard,* 91 Ga. App. 502, 86 S.E.2d 533 (1955). (The terms "sell," "exchange," or otherwise "dispose" of property were *ejusdem generis,* and the words "exchange" and "dispose" were synonymous with "sell").

objection because the testimony was a violation of both the hearsay and best evidence rules. It is clear, however, that the defendant was specifically objecting to the testimony on the grounds of relevancy. The proposed testimony, according to the defendant, was relevant to the value of *an automobile* but not *the vehicle* the defendant had promised. The Superior Court overruled the objection on this ground, and the defendant does not attack this ruling on appeal. Rather, it urges new grounds for the exclusion of the testimony, an objection based on an alleged best evidence and hearsay violation never made at trial level.

■■■ We cannot review the defendant's objections for the first time at the appellate level since an objection to evidence on specific grounds acts as a waiver to all grounds not specified or relied upon. *Spencer v. Burns,* 413 Ill. 240, 108 N.E.2d 413 (1952); 1 Field, McKusick & Wroth, Maine Civil Practice § 46.1 (2d ed. 1970); Glassman, Maine Practice § 51.2 (1967). Moreover, the plaintiff introduced three other witnesses who similarly testified as to the sticker price without objection from the defendant. Although, once having made a specific objection, the defendant need not necessarily have repeated its objection each time a witness testified to save *that alleged error* for appellate review, it is clear that where no specific objection *was ever* made on the grounds upon which the defendant now relies, the testimony becomes "consent evidence." *Warren v. Waterville Urban Renewal Authority,* Me., 235 A.2d 295, 299 (1967).

■■■ We have carefully considered the defendant's remaining argument that the evidence was insufficient to support the jury verdict as to damages and find it to be without merit. *Poulette v. Herbert C. Haynes, Inc.,* Me., 347 A.2d 596 (1975); *Beck v. Sampson,* 158 Me. 502, 186 A.2d 783 (1962).

The entry is:

Appeal denied.

Judgment affirmed.

POMEROY, WERNICK, ARCHIBALD, GODFREY, JJ., and DUFRESNE, A. R. J., concurring.

DUFRESNE, A. R. J., sat at oral argument as Chief Justice but retired prior to the preparation of the opinion. He has joined the opinion as Active Retired Justice.