727 P.2d 804

**The STATE of Arizona, Appellant,**

v.

**AMERICAN HOLIDAY ASSOCIATION, INC., Appellee.**

**No. 1 CA–CR 8523.**

Court of Appeals of Arizona, Division 1.

July 18, 1985.

Robert K. Corbin, Atty. Gen. by Steven J. Twist and John Pressley Todd, Phoenix, for appellant.

Thomas A. Thinnes, P.A. by Thomas A. Thinnes and Eleanor L. Miller, Phoenix, for appellee.

OPINION

HOWARD, Judge.

This is an appeal from the granting of defendant's motion to dismiss counts one through five of the indictment pursuant to Rule 16.5(b), Rules of Criminal Procedure, 17 A.R.S.[1] The issue is whether A.R.S. § 13–3307(A) applies to mail contests which appellee conducts in Arizona. We hold that it does and set aside the dismissal.

The record shows that appellee is a corporation registered to do business in California. It solicits persons through the mail to play for prizes in its word puzzle contest. In each of the contests the prize is an automobile. In each contest, players can also win additional cash prizes. To be considered for these additional cash prizes, the players must send appellee money, generally ranging in amounts from $1.00 to $7.00, $3.00 to $11.00, and $5.00 to $15.00, depending on the contest and depending on the contest level. The more money a player sends, the greater the possible cash prize.

Appellee offers two basic kinds of contests: a recruiting contest and a regular three-part contest. To play in the recruiting contest, a player must pay $1.00 to $3.00 for the opportunity to win an automo-

---

1. Counts six through eleven were also dismissed, but the state has not appealed from the dismissal of these counts.

bile. After the initial game there are three play-offs and then a tie-breaker. Pursuant to a Federal Trade Commission consent decree, appellee represents to the public that a given number of players can be anticipated for each round of the contest. It is estimated that in a recruiting contest called "Instant Skill Bingo," 850,000 persons will initially play, paying the initial fee of $1.00. This means that the initial game will bring into appellee's coffers the sum of $850,000. It is also estimated that in the first play-off game 663,000 will play, paying $3.00 each to play, adding an additional $1,989,000 to appellee's treasury. Without even considering the numbers of players and the additional money collected in play-off games two and three, appellee will have received $2,838,000. Since the maximum prize for a recruiting contest is $45,650, the gross fee to appellee is $2,793,350.

After the initial game each successful player is given an opportunity to pay more money for the opportunity to win cash prizes in addition to the automobile. A player who successfully completes the first play-off level is given a chance to risk more money for the opportunity to win additional cash prizes at each play-off level.

An example of the second type of contest, the regular three-part contest, is the "Win a Firebird" contest. This contest is actually three separate contests in one. There is a "Win a Firebird—*Boardwalk*" contest, a "Win a Firebird—*Monte Carlo*" contest, and "Win a Firebird—*Park Avenue*" contest. Each of these contests has an initial game, three play-off games, and a tie-breaker. For each part of the contest and for each level of the contests, appellee represents that it anticipates a certain number of players. Appellee estimates that in its "Win a Firebird" contest it will receive, after payment of the prize, a gross fee of $333,328.

From appellee's literature, it is unclear whether a player must pay American Holiday any money to play in any of these regular contests in which an automobile is offered as a prize. However, in each contest and at each level, American Holiday solicits the player to risk certain amounts of money for the opportunity to win additional cash prizes.

After the initial game, a player playing at one of the appellee's play-off levels must also pay a fee for postage if he wishes to continue in the contest without paying more money for the opportunity to win additional cash prizes. If the player wishes to pay additional money for the opportunity to win additional cash prizes, the postage fee is included.

The initial word puzzle for each type of contest is simple and becomes significantly more difficult at the final play-off levels. There is never more than one winner at the tie-breaker level. As the word puzzle becomes more difficult, the time in which the player must complete it becomes reduced from a number of months to a number of days. Appellee creates the word puzzles and has complete control over determining the difficulty of the word puzzles used in its contests. During the period between September 1982 through September 1984, appellee solicited persons living in Arizona in 120 of its contests.

Since the resolution of this case depends upon the application of A.R.S. § 13-3307(A), we hereby set it forth in pertinent part:

" ... no person may engage for a fee, property, salary, or reward in the business of accepting, recording or registering any bet, purported bet, wager or purported wager ... with respect to the result or purported result of any race, sporting event, contest or other *game of skill* or chance ..." (emphasis added)

Appellee contends that the statute does not apply because skill predominates over chance in its contests and because the entry fee is neither a wager nor a bet.

The evidence in the trial court was that to solve the puzzles requires skill. However, we note that our statute applies to games of skill as well as games of chance. If a "bookie" were accepting bets on the winner of the national spelling bee, undoubtedly a contest of skill, he could not

defend based on the fact that skill rather than chance was involved. So the determinative question is whether or not appellee was, in essence, accepting bets or wagers, as opposed to merely charging an entry fee to contestants for the privilege of partaking in the competition. One of the best cases which we have found on this subject is *Chenard v. Marcel Motors*, 387 A.2d 596 (Me.1978). There the Lewiston Lodge of Elks sponsored a golf tournament. The defendant, Marcel Motors, an automobile dealership, was asked to donate an automobile as a prize. To promote its business, the defendant accepted the proposal and agreed to give to any golfer who shot a hole-in-one a new Dodge Colt. The entrance fee for the hole-in-one contest was either ten or twelve dollars. These entrance fees went to the Elks Club and not to the defendant. Furthermore, the sum total of the entrance fees was not divided among the contestants as in an office pool. The state of Maine had a statute which made it illegal to gamble or to bet on any person gambling. The Maine court, in holding that Marcel Motors had not violated the gambling statutes, first noted the generally accepted distinction between illegal gambling or lotteries and legal competitions. For there to be a wager there must be two or more contracting parties, having mutual rights with respect to the money or other things wagered or staked and each of the parties necessarily risks something and has a chance to make something upon the happening or not happening of an uncertain event. But a purse or prize offered by a party, and to be awarded to the successful competitor in a contest in which such party does not engage, nor has any chance of gaining, but only perhaps of losing, lacks the element of a chance of gain or a risk of loss which characterizes the wager agreement. The court stated as follows:

"Payment of an entrance fee does not turn a legal competition into an illegal wager, at least where the fees do not make up the purse. [citations omitted] Of course, labels will not bind the courts, and if the 'entrance fees' collectively constitute a prize to be won by one of the contestants, the scheme will be found to be a wagering transaction. [citations omitted] ..." 387 A.2d at 600–01.

The *Chenard* court noted that Marcel Motors did not compete for the prize, did not derive a profit or chance of profit from the entrance fees paid to the participants and, in fact, could only lose because it did not receive the fees, which went to a third party not in privity with the defendant. It further noted that the automobile was not offered by the defendant as a lure to separate individuals from their money because the defendant's gain and the sum total of the entrance fees was not divided among the contestants as in an office pool. The participants were not primarily risking their fees in the hope of making a return on their money as in a wagering transaction, but were paying the fees for the privilege of participating in the tournament.

In contrast, appellee American Holiday derived a profit or a chance of a profit from the entrance fees paid by the participants. The automobiles and cash prizes were offered by American Holiday as a lure to separate individuals from their money for American Holiday's gain. As observed by the state of Florida in reviewing American Holiday's game in *Department of Legal Affairs v. Rogers*, 329 So.2d 257 (Fla.1976):

"Respondent's puzzle games operate in such a manner as to appeal to the gambling instincts of the contestants by allowing additional consideration or wagering as contestants become more and more involved in the several levels of each game." 329 So.2d at 260.

Each contestant in American Holiday's contest risks his money on the happening or not happening of an uncertain event— his winning the contest. American Holiday also takes a risk that there will be enough players in each contest for it to pay the cash prizes and the merchandise prizes. If there are enough players, it will make a profit. From this evidence it appears that American Holiday was in the business of

taking bets or wagers. The trial court should not have dismissed the indictment.

The order of dismissal as to counts one through five of the indictment is vacated and set aside and the case is remanded for further proceedings consistent with this opinion.

BIRDSALL, P.J., and FERNANDEZ, J., concur.

NOTE: This cause was decided by the Judges of Division Two as authorized by A.R.S. § 12–120(E).