727 P.2d 807

**The STATE of Arizona, Appellant,**

v.

**AMERICAN HOLIDAY ASSOCIATION, INC., Appellee.**

**No. 6672–PR.**

Supreme Court of Arizona, En Banc.

Sept. 23, 1986.

Robert K. Corbin, Atty. Gen. by John H. Hinchcliffe, Steven J. Twist, John Pressley Todd, Asst. Attys. Gen., Phoenix, for appellant.

Thomas A. Thinnes, P.A. by Thomas A. Thinnes, Martin Lieberman, Phoenix, for appellee.

FELDMAN, Justice.

Petitioner American Holiday Association, Inc. (American) conducts word puzzle "skill bingo" games through the mail. The State of Arizona indicted American under A.R.S. § 13–3307, alleging that American's games were illegal gambling operations. The trial court dismissed the indictment, finding as a matter of law that American's games are not prohibited by the statute. The court of appeals disagreed and reversed the judgment of dismissal. *State v. American Holiday Ass'n*, 151 Ariz. 309, 727 P.2d 804 (Ct.App.1985). We accepted American's petition for review to clarify the meaning of A.R.S. § 13–3307. Rule 31.19(c)(4), Ariz.R. Crim.P., 17 A.R.S. (Supp.1985). We have jurisdiction under Ariz. Const. art. 6, § 5(3) and A.R.S. § 12–120.24.

FACTS

American, a California corporation, conducts its word games throughout the country. The games are an interesting combi-

nation of bingo and crossword puzzles. Each game card has five rows of five separate blank spaces, for a total of 25 blank spaces. Arrows indicate the spaces in which the contestants are to spell bingo. Contestants choose words from an official word list (which varies for each game) and then place the words so that the letters necessary to spell bingo appear in the correct spaces. Each word or, in some games, each letter in each word is assigned a point value. Contestants win the games by using the words with the highest point values to fill out their game cards. Because different combinations of words from the official word list can be used successfully to spell bingo, the objective is to select those words with the highest point values. Given the number of potential combinations, especially when individual letters are given point values, it is often difficult to determine the combination resulting in the highest point total.

Participants pay $1 to $15 to enter American's games; prizes include cash and automobiles. Each contest includes several levels or playoffs. Pursuant to a consent decree with the Federal Trade Commission, American is required to disclose the anticipated number of players participating at each level. As the games progress, players may pay additional fees at each level to increase their potential cash prizes. However, after paying the initial fee, players are not required to pay additional fees to win an automobile, the prize having the highest value.

American's "Great American" contest is typical. A person may enter the game for $1 and compete for a Ford Escort. A $2 entry fee allows the player to compete for a Chrysler convertible; for $3 the prize is a Cadillac El Dorado. After paying the initial $1 to $3 fee a player can win one of the automobiles by successfully competing in the original and playoff games, and any necessary tie breaker. No additional fees are required. The game becomes progressively more difficult at each playoff level. Although several hundred-thousand persons may enter the game, there is usually only one winner. In addition to one of the automobiles, the winner may receive a cash prize of up to approximately $20,000 if he or she paid additional fees, ranging from $1 to $15, at each playoff level. American's brochures encourage players to pay the additional fees by highlighting past winners that have done so.

Contest prizes are not contingent on the number of players entering each game. Advertised prizes are always awarded. American places all the fees it receives into a general account. Prize accounts are then funded from the general account. American assumes the risk that it will lose money if entrance fees are insufficient to cover prize costs. From September 1983 through September 1984, American solicited persons living in Arizona for approximately 120 different contests.

## DISCUSSION

The question before us is whether American's business violates A.R.S. § 13–3307(A), which provides in pertinent part that

> no person may engage for a fee, property, salary or reward in the business of accepting, recording or registering any bet, purported bet, wager or purported wager ... with respect to the result or purported result of any race, sporting event, contest or other game of skill or chance or any other game of skill or chance or any other unknown or contingent future event or occurrence whatsoever.

The statute contains four elements which pertain to this case. The state must prove that American (1) for a fee (2) engaged in the business (3) of accepting bets or wagers (4) on the results of games of skill or chance. Since the uncontroverted facts show that, for profit, American operated a business in which it awarded prizes on the results of its games, elements 1, 2, and 4 are clearly satisfied. Thus, to determine whether American has violated the statute we must answer only one question: are the fees charged or collected by American

"bets" or "wagers" as those terms are used in A.R.S. § 13–3307?

The court of appeals correctly reasoned that characterization of American's contests as either games of skill or chance has little relevance to whether the fees are illegal bets or legal entrance fees. 151 Ariz. at 310, 727 P.2d at 805. The statute explicitly covers games of "skill or chance." A.R.S. § 13–3307(A). Thus, as the court of appeals noted, a bookie accepting bets on the winner of the national spelling bee cannot defend against prosecution under A.R.S. § 13–3307 by arguing that spelling bees are games of skill, not chance. 151 Ariz. at 310, 727 P.2d at 805. Assuming American's games require skill, the question is whether American is accepting bets on the winner of each game or merely charging contestants an entrance fee for the privilege of competing.

Obviously it is not illegal for the directors of a contest, for example the national spelling bee or the local rodeo, to charge an entrance fee. We think it equally obvious that not every contest charging an entry fee *and* awarding a prize becomes an illegal gambling operation. *See, e.g., Faircloth v. Central Florida Fair, Inc.,* 202 So.2d 608, 609 (Fla.Dist.Ct.App.1967) (prohibition of betting on games of skill intended to proscribe wagering on the results of games as opposed to playing games for prizes). The distinction seems well taken; an entrance fee does not suddenly become a bet if a prize is awarded. If the combination of an entry fee and a prize equals gambling, then golf tournaments, bridge tournaments, local and state rodeos or fair contests, and even literary or essay competitions are all illegal gambling operations under A.R.S. § 13–3307. *Faircloth, supra.* It would be "patently absurd" to conclude that these types of contests are gambling operations. *State v. Prevo,* 44 Haw. 665, 673, 361 P.2d 1044, 1049 (1961) (statute prohibiting "any other game" in which money may be won applies only to gambling games and not those in which contestants pay entry fees to compete against each other for prizes).

Spelling bees, golf tournaments, and American's word games lack many of the attributes of what we commonly refer to as "gambling." First, such contests are not like most bookmaking operations because prizes are not awarded on the basis of the outcome of some event involving third parties. The prize offered is paid only to participants and the participants themselves determine the outcome. Second, such contests do not involve bets between participants in a contest; it is known from the start that some nonparticipating party—the sponsor—will award the prize. Finally, such contests are dissimilar to any gambling operation because the amount of the prizes to be awarded is known from the start and does not depend on the bookies' "odds" or the number or amount of entry fees actually received.

The essential significance of these distinctions between typical gambling operations and contests charging entry fees as a condition to the award of prizes is illustrated by the decisions of the New York Court of Appeals and the Nevada Supreme Court in *People v. Fallon,* 152 N.Y. 12, 46 N.E. 296 (1897), and *Las Vegas Hacienda, Inc. v. Gibson,* 77 Nev. 25, 359 P.2d 85 (1961), respectively. *Fallon* involved the propriety of a horse race sponsored by the Westchester Racing Association. Owners of the competing horses paid entrance fees to the association. Those fees were deposited in the association's general treasury. The association then awarded prizes for each race. The prizes were for a definite, guaranteed sum, without regard to the amount of entrance fees received. Under these facts, the court held that the entrance fees were not illegal wagers:

> There is a plain and obvious distinction between a race for a prize or premium contributed [by the association] and a race where the stake is contributed by the participants alone, and the successful contestant is to have the fund thus created. The latter is a race for a mere bet or wager, while the former is for a prize offered by one not a party to the contest.

152 N.Y. at 19, 46 N.E. at 297. As the court noted, if an entrance fee becomes an

illegal wager whenever a prize is offered, then

> it would seem to follow that the farmer, the mechanic, or the stock breeder who attends his town, county, or state fair, and exhibits the products of his farm, his shop, or his stable, in competition with his neighbors or others, for purposes or premiums offered by the association, would become a participant in a crime, and the officers offering such premium would become guilty of gambling.... Those transactions are in all essential particulars like this. In those, as in this, one of the parties strives with others for a prize; the competing parties pay an entrance fee for the privilege of joining in the contest; and in those cases, as in this, the entrance fee forms a part of the general fund from which the premiums or prizes are paid. Indeed, all those transactions are so similar to this as to render it impossible to discover any essential difference between them.

*Id.*

In *Gibson*, the owner of a golf course publicly offered $5,000 to any person shooting a hole-in-one while playing golf on his course. The offer was premised on compliance with certain conditions, including payment of a fifty-cent entry fee. Plaintiff shot a hole-in-one and sued for the $5,000. The owner refused to pay, arguing that his offer to pay the $5,000 was an illegal gambling contract. The Nevada Supreme Court enforced the agreement, holding that payment of an entrance fee that "does not *specifically* make up the purse or premium contested for does not convert the contest into a wager." 77 Nev. at 29, 359 P.2d at 87 (emphasis added).

At least with regard to the *initial* entrance fees charged by American, we find the principles articulated in *Faircloth, Fallon,* and *Gibson* persuasive. American did not itself compete in the word games and all prizes were guaranteed regardless how many people entered. It is true, as the court of appeals noted, that the fees collected by American for each game are more than sufficient to cover prize costs. Never-

theless, as currently structured, American funds its prize accounts from its general account without regard to the amount of entrance fees received. If the entrance fees exceed the operating costs (including prize money), American makes a profit; if not, it takes a loss. In either event, the prize guaranteed to contestants remains unchanged. The court of appeals' reliance on dictum from *Chenard v. Marcel Motors*, 387 A.2d 596 (Me.1978), for the proposition that American's games are gambling operations because American typically profits from its business, is misplaced. We can discern no reason, and *Chenard* gives none, why the profitability of a business should impact on whether entrance fees are characterized as bets or wagers. Furthermore, like *Gibson*, *Chenard* involved the propriety of a hole-in-one golf tournament awarding prizes. Citing *Gibson* and *Prevo* with approval, *Chenard* held that entrance fees paid for a chance to win the tournament prize—an automobile—were not illegal bets. 387 A.2d at 601.

In short, the cases cited above, including *Chenard*, all hold that the payment of an entrance fee is not an illegal bet or wager in an otherwise legal competition for prizes to be awarded by a nonparticipant, at least where the entrance fees do not specifically make up the prize purse. The Montana Supreme Court put the distinction another way, stating that a bet is a situation in which the money or prize belongs to the persons posting it, each of whom has a chance to win it. Prize money, on the other hand, is found where the money or other prize belongs to the person offering it, who has no chance to win it and who is unconditionally obligated to pay it to the successful contestant. *Toomey v. Penwell*, 76 Mont. 166, 173, 245 P. 943, 945 (1926). We see no distinction in principle to be drawn on the basis of whether the sponsor of the contest hopes to make or actually does make a profit on its operation. The chance of profit and the risk of loss on any business operation is perhaps a form of gambling, but one that has yet to be proscribed by the state legislature. We hold, therefore, that reasonable entrance fees

charged by the sponsor of a contest to participants competing for prizes are not bets or wagers. The entrance fee charged by American is not within the proscription of A.R.S. § 13–3307.

The state argues that even if the initial entrance fees are not bets or wagers, the additional fees paid by some participants to compete for cash prizes in addition to the merchandise prizes are bets or wagers. These additional fees are more problematic. The participant has already entered the contest by paying the initial fee and the additional payment merely allows him or her to compete for a bigger prize on the same game. Therefore, it is easier to characterize these extra payments as wagers between each individual participant and American, the player betting American an additional amount of money that he or she will win the game. As the Florida Supreme Court noted in a different context,[1] once a player gets involved in a game, American's "puzzle games operate in such a manner as to appeal to the gambling instincts of the contestants by allowing additional consideration or wagering as contestants become more and more involved in the several levels of each game." *Department of Legal Affairs v. Rogers*, 329 So.2d 257, 260 (Fla.1976).

On the other hand, it may be argued that the additional payments are nothing more than an additional entrance fee charged those who wish to compete in a higher prize bracket. In support of this view, it must be noted once more that neither the initial entrance fee nor the additional fees make up the purse and that the competition is one between participants for prizes, with the sponsor obligated to pay a guaranteed sum in prize money out of its own funds, regardless of whether the entrance fees or additional entrance fees equal the prize money.

Given the two characterizations which can be applied to the additional entrance fee, we feel constrained for several reasons to adopt the more narrow, and refrain from a broad, interpretation of the words used in the statute. First, although A.R.S. § 13–3307 has never been interpreted by an Arizona appellate court, its predecessor, A.R.S. § 13–440, was reviewed by the court of appeals in *State v. Cartwright*, 20 Ariz. App. 94, 510 P.2d 405 (1973). *Cartwright* described the statute's legislative history as focusing on those engaged in the "business of illegal bookmaking activities." *Id.* at 98, 510 P.2d at 409 (emphasis deleted). Some support exists for *Cartwright's* reading of the legislative history. Section 13–440 was originally enacted as part of a house bill legalizing pari-mutuel wagering on horse racing. It was apparently intended to "prohibit[ ] persons other than pari-mutuel permittees from engaging in the business of accepting bets or wagers of any kind." 1971 Ariz.Sess.Laws Ch. 130 (quoting the title of House Bill 337, which became § 13–440). Similarly, the state attorney general, Gary Nelson, testified to the House Ways and Means Committee that § 13–440 "would prohibit bookmaking establishments." Minutes of Meeting on House Bill 337, House Committee on Ways and Means, April 6, 1971; *see also* Minutes of Meeting on House Bill 337, Senate Committee on Commerce and Labor, April 19, 1971 (attorney general testified that § 13–440 "was needed to help State agencies fight organized crime"). Since A.R.S. § 13–3307 is substantially the same statute as § 13–440, we assume that the legislature's objective has not changed. This conclusion finds support in the language of A.R.S. § 13–3307(B), which proscribes "runners" from transmitting the wagers and bets proscribed by subsection (A) of § 13–3307. Runners, of course, are usually employed by bookies, pool operators, and the like. Conceding that the legislature probably never adverted to the issues of this case, it is difficult to fit American's

---

1. The court's decision in *Department of Legal Affairs v. Rogers*, 329 So.2d 257 (Fla.1976), involved American's compliance with Florida's "little F.T.C." act. Although Florida has a gambling statute similar to A.R.S. § 13–3307, *see Faircloth v. Central Florida Fair, Inc., supra,* Florida has not brought criminal charges against American.

puzzle contest within the framework of expressed legislative objectives.

The next factor which supports a strict, narrow interpretation of the terms "bet or wager" pertains very simply to common understanding of gambling. The statute in question is obviously intended to declare certain types of gambling illegal. It is in a chapter which deals exclusively with gambling and gambling games. *See* A.R.S. §§ 13–3301 to 13–3307 (proscribing gaming by cards, slot machines, percentage games, and lotteries and authorizing seizure of gambling devices). Paying an entrance fee in order to participate in a game of skill, or mixed skill and chance, in the hope of winning prize money guaranteed by some sponsor to successful participants, is a traditional part of American social life. *Faircloth v. Central Florida Fair, Inc., supra; State v. Prevo, supra.* In the absence of explicit legislative intent or specific statutory language, we are reluctant to adopt a statutory interpretation which would turn sponsors of golf, tennis or bridge tournaments, rodeos, livestock, poultry, and produce exhibitions, track meets, spelling bees, beauty contests, and the like into class 6 felons operating gambling games. *See People v. Fallon, supra; Las Vegas Hacienda, Inc. v. Gibson, supra.*

Finally, A.R.S. § 13–104 instructs us to interpret penal statutes "according to the fair meaning of their terms to promote justice and effect the objects of the law, including the purposes stated in § 13–101." *See also State v. Perkins,* 144 Ariz. 591, 594, 699 P.2d 364, 367 (1985). The only purpose articulated in § 13–101 that is applicable here is "[t]o proscribe conduct that unjustifiably and inexcusably causes or threatens substantial harm to individual or public interests." It seems clear that bookmaking—the legislature's only announced target in enacting § 13–3307—threatens individual and public interests. It would be naive, however, for this court to work itself into a moralistic fervor over gambling in Arizona. The legislature has seen fit to license and permit many forms of gambling once considered anathema. These include horse racing and dog racing, both opera-

tions in which the bettor is not a participant and the money laid down is not an entrance fee but a wager between parties who are not contestants and whose gain or loss will be determined by the results of a game played by others. On most of these activities, the state takes its percentage, something that can only be described as bookmaking, though, by legislative edict, not illegal. Finally, in the largest gambling game ever seen in Arizona, the state acts as sponsor, weekly collecting and pocketing huge sums of money in a game known as the Arizona Lottery. We do not question the legislative wisdom to permit such activities; that decision is solely within the legislature's powers. However, it is difficult in such a climate to find any moral imperative for a sweeping interpretation of a gambling statute in order to make the sponsor of a crossword puzzle contest a criminal while his next door neighbor, betting a dollar with the state to win a million in the state lottery, is a virtuous citizen. If the legislature desires to criminalize the payment or acceptance of modest entrance fees in order to win a prize in a competition such as a crossword puzzle contest, it must do so by language much more specific than that contained in A.R.S. § 13–3307. It has done just that in the other sections of A.R.S. tit. 13. *E.g.,* A.R.S. § 13–3301 (Supp.1985) (outlawing conducting games of "stud poker, draw poker, bluff, fan tan, thaw, . . ." ).

## CONCLUSION

We hold that neither the initial entrance fee nor the voluntary additional fees charged participants in the crossword puzzle contests operated by American are bets or wagers and that, therefore, A.R.S. § 13–3307 is inapplicable. The decision of the court of appeals is vacated. The judgment of dismissal entered by the trial court is affirmed.

HOLOHAN, C.J., GORDON, V.C.J., and HAYS and CAMERON, JJ., concur.